```
1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2

3    United States of America,    ) Criminal Action
                                  ) No. 21-mj-609
4                  Plaintiff,     )
                                  ) DETENTION HEARING
5    vs.                          )
                                  ) Washington, DC
6    Raymond Glover,              ) November 15, 2021
                                  ) Time:  11:15 a.m.
7                  Defendant.     )
     _____
8
                    TRANSCRIPT OF DETENTION HEARING
9                          HELD BEFORE
                   THE HONORABLE JUDGE ZIA M. FARUQUI
10                  UNITED STATES MAGISTRATE JUDGE

11   _____

                       A P P E A R A N C E S
12
     For the Plaintiff:      April Russo
13                           Assistant United States Attorney
                             555 Fourth Street, NW
14                           Washington, DC  20001
                             (202) 252-1717
15                           Email:  April.russo@usdoj.gov

16   For the Defendant:      Jose German
                             Assistant Federal Public Defender
17                           625 Indiana Avenue, NW
                             Suite 550
18                           Washington, DC  20004
                             (202) 208-7500
19                           Email:  Jose_german@fd.org

20   Probation Officer:      John Copes

21   Proceedings reported by audio recording.

22   _____

     Transcribing Court Reporter:
23                           Janice Dickman, RMR, CRR, CRC
                             Official Court Reporter
24                           United States Courthouse, Room 6523
                             333 Constitution Avenue, NW
25                           Washington, DC  20001
                             202-354-3267
```

1          THE COURTROOM DEPUTY:  Case 21-MJ-609, *United States*

2    *of America versus Raymond Glover*.  This is a motion hearing to

3    be held by video.  Will the parties please introduce themselves

4    to the Court, beginning with the government.

5          MS. RUSSO:  Thank you.  April Russo on behalf of the

6    government.  Good morning, Your Honor.

7          MR. GERMAN:  Good morning, Your Honor.  Jose German

8    on behalf of Mr. Glover.

9          PRETRIAL SERVICES:  Good morning, Your Honor, John

10   Copes, pretrial services.

11         THE COURT:  Great.  And to begin with, Mr. German, I

12   just want to confirm, I can't see your client, but I believe

13   we're able to get him on the phone.

14         Mr. Glover, are you able to hear us okay?

15         THE DEFENDANT:  Yes.  Yes, Your Honor.

16         THE COURT:  Okay.  Great.  Mr. German, I just want to

17   confirm that your client, in light of the pandemic, agrees to

18   have this proceeding by audio and video?

19         MR. GERMAN:  (No audible response.)

20         THE COURT:  Okay.  Great.  Thank you.  Mr. German, I

21   had a chance to read your paperwork.  I want to just start with

22   this, I'm primarily focused on the motion for reconsideration.

23   I think that the motion to transfer Mr. Glover to CTF appears

24   to have been overcome by events and that he's been transferred

25   to the Lewisburg facility.  But if you want to be heard further

1    on that, we can.

2            Why don't we actually start with that?  Is there

3    anything you want to add in terms of that?  Noting that my

4    abilities to control what the marshal service does has some

5    limitations, but I can always make request.  But, anything on

6    that, Mr. German?

7            MR. GERMAN:  Yes, Your Honor.  I mean, I certainly

8    understand that it is a lot more difficult now that he has been

9    transferred.  And I will say that this is part of the problem

10   here, right, that we're seeing.  Mr. Glover was not supposed to

11   be moved, that's what we were told, that's what we were

12   operating with, and here we are, he was just transferred out

13   there without any notice to us or anything like that.

14           But, you know, I understand that the Court -- what

15   the Court can do here is limited, and I would still ask the

16   Court to at least recommend Mr. Glover be transferred back to

17   CTF for the reasons that we stated, you know, in our motion.

18   And, obviously, I don't think anybody can disagree that

19   incarceration is something that's already extremely difficult

20   and isolating, especially when it's -- you know, you're going

21   in there for the first time, like Mr. Glover.  And I think to

22   just send him up, four hours away, where we know he's going to

23   have an incredibly difficult time communicating with his

24   family, with his support system, you know, I think that's just

25   unnecessary here and, you know, unduly punitive for no reason,

1      when we are able to keep him -- if Your Honor determines that

2      he cannot be released, we are able to keep him at CTF.

3             I'm not sure what the government's opposition is

4      here, besides that this just shouldn't happen.  I don't know

5      what the real objection is to that, to placing Mr. Glover at

6      CTF.  I can tell the Court that, you know, we -- I haven't

7      personally spoken to Mr. Glover since he was sent up there, but

8      the preliminary -- what we're hearing about Lewisburg is not

9      good.  And I can only see -- in the very near future it's going

10     to be some new litigation regarding the conditions up there.

11            So, yes, Your Honor, based on that and based on what

12     we said in our motion, we're asking the Court at least

13     recommend that the marshals bring him back to CTF, if he's not

14     released.

15            THE COURT:  Okay.  Great.  So why don't we just start

16     with that, Ms. Russo.  Any thoughts or comments in response?

17            MS. RUSSO:  I think the problem is, Judge, so, one of

18     the -- there were complaints about the conditions in the -- in

19     part of the D.C. jail, and so I think the marshals undertook an

20     investigation in an effort to resolve that and they came up

21     with the fact that the conditions weren't good enough and that

22     they needed to rectify that.  So this was an effort by them to

23     do the right thing.  And the issue is that we're getting

24     motions like this throughout the courthouse.  Everybody would

25     prefer to be at CTF, rather than be moved to a distance very

```
 1    far away.  But I think that's why -- it's not that the
 2    government has a technical opposition to Mr. Glover being at
 3    CTF, the issue is that this has to be the marshal's decision
 4    because we don't know all of the different offenders they have
 5    and what the issues are with placement.  And I do know for a
 6    fact that not everyone can go to CTF.  And so they're going to
 7    have to make decisions about who they have room for at CTF, and
 8    they know better than I do or the Court does or the defendant
 9    or the defense attorney does as to how to coordinate that.
10         And so I think it's not that we have a technical
11    opposition, I have no problem with Mr. Glover staying near --
12    near DC, or even at CTF, it's that I have to defer to the
13    marshals on this because I don't know all the logistical issues
14    that they are having to deal with in trying to accommodate,
15    sort of, the move out of (unintelligible) because of the
16    problems that were existing there.
17         THE COURT:  Well, I think -- from what I can tell,
18    the defendant, Mr. Glover, has requested that he be -- that I
19    make a recommendation, but understands -- sounds like
20    Mr. German understands that I can't necessarily effect that
21    through a judicial order.  But I hear what you're saying, also,
22    Miss Russo, that there's a lot of moving parts on this and the
23    marshal service is doing its best to mitigate the harm to all
24    of the people that were detained in CTF.
25         And so I know that they're looking at this on a
```

1    case-by-case basis, and so I'll take that into consideration

2    and decide how I want to handle that.  But, primarily, first,

3    we are here to discuss, I think, the more substantive question

4    is the motion for reconsideration.

5           So, Mr. German, it's your motion, if you want to

6    begin.  I've read your paperwork.  I'm happy to hear more, of

7    course.  I would like to get as much detail as I can about

8    third-party custodians.  And I'm happy to talk to them, as

9    well, directly.  But first I would like to hear from you, about

10   any additional information.

11          I will note that although the government, you know,

12   made an argument, I do believe that you are correct, that this

13   is a new fact which does allow me to reconsider, because it is

14   something that impacts my determination as to whether or not

15   someone is a danger to the community.  All right.  If you want

16   to proceed, Mr. German.

17          MR. GERMAN:  Your Honor, I apologize.  May I just

18   have a brief moment?  My AC is really loud and I don't have --

19   I'm having a hard time hearing the Court.  So let me just have

20   one moment just to turn it off.

21          THE COURT:  Absolutely.  Just let me know when you're

22   ready.

23          (Pause.)

24          MR. GERMAN:  My apologies, Your Honor.

25          Your Honor, I'll try to be brief, just given that

1    we've had multiple hearings about this recently and I'm pretty

2    sure the Court knows how I feel about this issue.  But, I just

3    want to touch on a few things about Mr. Glover's case.

4           At the last hearing the Court clearly heard that

5    Mr. Glover is someone without -- absolutely no criminal

6    history, someone who has held a job for over 20 years, and

7    someone who has a really strong support system.  And I can tell

8    the Court that, you know, that has only been magnified for me

9    since that hearing.  I'm in constant communication with

10   multiple members of Mr. Glover's family.  There's no doubt that

11   Mr. Glover has a family who cares about him and loves him and

12   is really interested in his well-being.  I think, to put it

13   differently, Mr. Glover has all the pro-social factors that

14   we're looking for when considering whether someone should be

15   released.

16          And that brings me to the conditions that we're

17   proposing here.  Now, at the last time we couldn't get a

18   third-party custodian that could be approved by pretrial.  So

19   that was, understandably, a hurdle there for us.  That is

20   clearly not the case now.  But, more importantly, the home that

21   we are proposing now is one without internet, which was not the

22   case last time.  And, you know, frankly, it's almost never the

23   case because of how difficult it is to find someone that lives

24   without internet.

25          Now, predictably, that's not enough for the

1    government.  You know, in almost every case like this we sort

2    of see the same -- we hear the same argument.  No matter how

3    strict the conditions are, if there's internet in somebody's

4    home, that's going to be a problem for them.

5          And I think the Court should, you know, really think

6    about that and analyze the request under that light.  Because

7    if the problem is -- and what I keep coming back to in these

8    cases is, it's never enough, right?  There's just no condition

9    that can be put in place that they would ever find that is

10   satisfactory.  You know, they have demonstrated to us there's

11   just no -- there's no discretion here for that.  Every case,

12   every person charged with this has to be detained.  And, you

13   know, I don't have to tell the Court why that's a problem.

14         Now, they've -- they've cherry-picked some cases from

15   Detroit here.  I'm not sure why Detroit is the, I guess, lucky

16   jurisdiction they've chosen for this, but, you know, I'm not --

17   obviously, Your Honor, I didn't have time to look up all the

18   cases where people have been released and compliant.  But, I

19   don't think I have to because I know the Court knows that for

20   every four cases, there are likely dozens of cases where people

21   have been released and they remain compliant.

22         So I'm not sure what any of those cases have to do

23   with Mr. Glover.  Certainly, I don't know why there's pictures

24   of someone accused of making pipe bombs in their opposition.  I

25   guess I have somewhat of an idea why they're doing that.  But,

1    I'm sure the Court does, too, so I probably don't even need to

2    get into that.

3             The one thing I did not mentioned in the conditions

4    for those folks was a third-party custodian.  And it's possible

5    there might be (unintelligible) in the opposition.  But that is

6    key, right?  Because what the third-party custodian is doing

7    for the Court is telling them that there's someone here who is,

8    you know, putting their neck on the line, essentially.  And I

9    can tell the Court that no matter how much Ms. Sarita or

10   Ms. Grace love Mr. Glover, there's just no way they're going to

11   subject themselves to criminal prosecution over him.  That's

12   just not going to happen here.  And I think that's really

13   important for the Court to consider, you know, when looking at

14   those other cases.

15            But, I think, beyond that, the problem also with

16   those cases is that it incites the Court to ask the wrong

17   question, because the question is not what other -- what are

18   the random ways we can imagine someone violated their

19   conditions of release, because in every case, every scenario

20   there will be a random way in which someone can violate their

21   conditions.  So by that logic, no one would be released.

22            The question is, are there conditions that can

23   reasonably assure the community's safety and their return to

24   court?  And the answer here is yes.  Because not only are we

25   proposing strict conditions, you know, one that is not almost

1    ever available to us, we actually have, in this case, we have

2    to remember we have a 41-year-old man here without any prior

3    criminal record.  So I think we should presume that he is going

4    to be able to follow the Court's directions.  But, of course,

5    it's not just that.

6           Mr. Glover, you know, unfortunately, has seen

7    firsthand, sort of, the horrifying conditions at the D.C. jail.

8    You know, the government, you know, uses some language in their

9    opposition for transfer to CTF that, you know, frankly, I

10   believe some folks at the jail will probably take issue with;

11   they use words like "unsanitary" and things like that.

12          I don't know if the Court was able to hear some of

13   the testimony at last week's D.C. council emergency meeting on

14   this, but, you know, it's folks in there talking about how, you

15   know, they're being treated worse than dogs, worse than

16   animals.  That's the kind of treatment I've been talking about

17   there.  So it's not just conditions are unsanitary, it's

18   horrifying conditions at that place.

19          So Mr. Glover clearly, clearly knows what's at stake

20   here if he were to violators his conditions.  And as I alluded

21   to earlier, Your Honor, you know, we're hearing from Lewisburg,

22   you know, there's also problems up there.  So I certainly don't

23   believe that that's the solution.  I think we are very, very,

24   very likely going to be in the same boat really quickly.  And I

25   think the fear is, of course, you know, that there's an

1    uncomfortable truth here that we have to deal with, and that is

2    that, you know, obviously, these conditions, the problems at

3    the jail have not been raised, you know -- they're not being

4    raised for the first time.  They've been raised for a very long

5    time and it's only now that certain, you know -- because of

6    certain folks at the jail that they're getting -- that it's

7    getting attention.  That is an uncomfortable truth that we've

8    got to deal with.  But none of those folks are moved to

9    Lewisburg.

10          So my fear is that when we start dealing with the

11   issues at Lewisburg and we start seeing people complaining

12   about the conditions up there, that we're going to run into

13   some real problems, because at the D.C. jail it's been years of

14   people saying, you know, that place is incredibly problematic,

15   and it's only recently that we've been getting -- that there's

16   been any attention to it.

17          So, Your Honor, for all these reasons, I think the

18   Court should consider placing Mr. Glover on high intensity

19   supervision.  Again, we are asking for very strict conditions.

20   We remain amenable to any conditions the Court thinks is

21   necessary here.  Again, I think the fact that this is a home

22   without internet -- I'm just not sure how that -- you know,

23   that's usually the main thing that the government is bringing

24   up here.  So I'm not sure, without that, like, what they're --

25   what the argument is for why they believe Mr. Glover is going

1    to violate his conditions here.  So for all those reasons,

2    we're asking for Mr. Glover to be placed on high intensity

3    supervision.

4            THE COURT:  Thanks, Mr. German.  Can you tell me just

5    a little bit about the background of the third-party

6    custodians; their relationship with Mr. Glover, kind of what

7    the layout of the house is?  I'm happy to inquire of them, too.

8    I don't know if you've gotten to that granular of a level, but

9    can you tell me a little bit about their situation?  I know you

10   indicated to me that -- I think, if you can tell me the names

11   again, I think, Ms. Rita is -- she is retired and at home.  But

12   if you can just go through kind of -- what does third-party

13   supervision look like in this home?  You know, that would be

14   helpful to hear.

15           MR. GERMAN:  Certainly, Your Honor.  So, Sarita

16   Contee is Mr. Glover's cousin and Ms. Grace Contee, who is

17   sitting down, she is his aunt, Rita's mother.  Rita --

18   Ms. Grace Contee is retired, Your Honor.  She is at home by

19   herself.  Obviously, no children in the house or anything like

20   that.  The home -- I'll let them speak to this as well -- it's

21   a two-level home, I believe, with three bedrooms in the home,

22   Your Honor.

23           And, you know, part of the reason why we are adding

24   Rita, her daughter, as a third-party custodian is because she

25   lives by herself, so, obviously, there's going to be times

1    where she has to leave the house, she has to go grocery

2    shopping, she has to run her errands, she has to go to the

3    doctor, you know, whatever it may be.  And Ms. Rita Contee

4    has essentially volunteered, she will stay there during the day

5    in order to facilitate that.

6              So, basically, you know, what we're proposing is for

7    Ms. Rita and Grace to be there throughout the day together.

8    Obviously, Rita Contee doesn't live there, so she'll leave, you

9    know, in the evening.  But at that point there will be no

10   reason for Grace to be leaving the house.

11             So, essentially Mr. Glover is going to be monitored

12   24 hours a day, Your Honor.  That's sort of the system that we

13   are putting in place here.  I'm happy to answer any other

14   specific questions the Court has.

15             THE COURT:  All right.  You indicated that there's no

16   internet.  How about smart devices of any kind?  Do you know?

17   Or, again, I can inquire --

18             MR. GERMAN:  Yes, Your Honor.  My understanding --

19   and, again, my understanding is that Grace does have a cell

20   phone.  (Unintelligible) talked about it.  You know, there's no

21   issue (unintelligible).  Mr. Glover would actually have no

22   access to that device.  It's tough to ask, these days, to not

23   have a smart device.  I think not having internet is already

24   big enough.

25             THE COURT:  I meant, was there anything else besides

1    a smart phone?  I'm sorry, Mr. German.

2              MR. GERMAN:  I don't believe so, Your Honor.

3              THE COURT:  I see Ms. Rita shaking her head no, so

4    I'll inquire from her as well.  So, Miss Grace will be there

5    during the day.  Miss Sarita will be there -- is it every week

6    day, or weekends, as well, during the day?  Maybe I should just

7    ask her, it sounds like it might be easier.  Is that all right,

8    Mr. German?

9              MR. GERMAN:  That's fine, Your Honor.

10              THE COURT:  Hi, Miss Sarita.  If you could unmute,

11    please, your screen, Ms. Sarita.

12              MS. SARITA CONTEE:  Hello.  How are you doing?

13              THE COURT:  Fine.  Thank you for being here.  I

14    appreciate you.  I appreciate you, Miss Grace, as well, for

15    being here.

16              May I ask Mr. Tran to swear you in, so that I can be

17    sure and the record is clear that you're being truthful with

18    everything you state to me.  That means if you're not truthful

19    in something you state, you could be criminally prosecuted for

20    perjury.  Lying to me is in fact a crime, where I can even hold

21    you in contempt.  So it's very important that if you don't

22    understand something, you just let me know and we'll talk

23    through it.  Okay?  I know sometimes it's human nature to want

24    to say something, answer a question.  But you have to be real

25    careful about what you listen to, because this isn't just with

1    Mr. Glover, now you're putting yourself out there.  This is

2    your life.  So I just want you both to be very careful.

3              So Mr. Tran, if you could swear in both witnesses.

4              THE COURTROOM DEPUTY:  I'm sorry.  I have Ms. Sarita

5    Contee.  What is the name of the second individual?

6              THE COURT:  I believe Miss Grace Contee.

7              Miss Sarita, is that right?

8              MS. SARITA CONTEE:  Yes, this is Sarita Contee.

9              THE COURT:  Say that again.

10             MS. SARITA CONTEE:  This is Sarita Contee.

11             THE COURT:  Got it.  How about your mother?  What's

12   her full name?

13             MS. SARITA CONTEE:  Her name is Grace Contee.

14             THE COURT:  Okay.  Go ahead, Mr. Tran.

15             (Whereupon Grace Contee and Sarita Contee were duly

16   sworn.)

17             THE COURT:  Okay.  Thank you both.  So, Mrs. Sarita,

18   I want to first talk to you.  How many -- tell me your

19   schedule.  When do you think that you'll be able to be in the

20   house?

21             MS. SARITA CONTEE:  So, I'll be -- I'll be able to be

22   at my mom's house from 8 o'clock to -- from 8 o'clock to, like,

23   4 every day.  Every morning, every day until my kids come home

24   from school, then I have to pick my kids up from school and go

25   home.  And that's when Raymond will be -- it will be just --

1    Raymond and my mother will be in the house.  But I left them

2    over there.  I do have a husband who will sit with my kids, if

3    need be, if I need to go back over there to sit with Raymond

4    for any apparent reason at all.

5              THE COURT:  Okay.  And how about -- what's the

6    schedule on the weekend?

7              MS. SARITA CONTEE:  So, my weekend schedule, my kids,

8    sometimes they go to their grandmother's house in Baltimore and

9    sometimes they go to my -- I have a oldest daughter and they go

10   to my oldest daughter's house on the weekends sometimes.  So,

11   you know, it could be -- I can have them this weekend and they

12   can be gone next weekend.  So, you know, it varies.  But, they

13   will not -- they -- they do not and will not be at my mom's

14   house for no apparent reason at all.

15             THE COURT:  Understood.  You're one step ahead of me

16   Ms. Sarita.  So just so we're clear, you understand that no

17   children would be allowed, anyone under 18, including not only

18   yours, but none would be allowed to come into the house.  Do

19   you understand that?

20             MS. SARITA CONTEE:  Yes, sir.

21             THE COURT:  Okay.  And, so, basically what I'm

22   hearing is that on the weekend, that if you needed to, you

23   could come and spend a couple hours at a time there, but the

24   plan would be, really, just Monday through Friday you would be

25   there every day from 8 a.m. to 4 p.m.; does that sounds right?

```
 1              MS. SARITA CONTEE:  Yes, sir.
 2              THE COURT:  Okay.  Great.  Can you tell me a little
 3     bit about the layout of your mom's house?  Or I can hear from
 4     her, whoever is easier to talk about it.
 5              MS. SARITA CONTEE:  Mom?
 6              MS. GRACE CONTEE:  Grace Contee.  I got a
 7     four-bedroom, kitchen, two bath (unintelligible).
 8              THE COURT:  You said four-bedroom, is that right?
 9              MS. GRACE CONTEE:  I have four bedrooms.  Kitchen,
10     bath -- two bathrooms, a dining room (unintelligible) and back
11     porch.
12              THE COURT:  Okay.  You're just breaking up a little
13     bit, Miss Grace, but I think I heard you.  So, I got most of
14     what I needed out there.
15              What bedroom would you -- thank you, Mrs. Sarita.
16              Miss Grace, what bedroom would you be asking to put
17     Mr. Glover in?
18              MS. GRACE CONTEE:  He would be upstairs in the room
19     next to the bathroom, next to my room.
20              THE COURT:  So that's next to your room?
21              MS. GRACE CONTEE:  The biggest room.
22              THE COURT:  What was that?  You have the biggest
23     room?
24              MS. GRACE CONTEE:  The biggest room.
25              THE COURT:  All right.  As well you should.
```

1          MS. GRACE CONTEE:  (Unintelligible) but Raymond will

2     be in the room next to the bathroom.

3          THE COURT:  Understood.

4          MS. GRACE CONTEE:  It's in between --

5          THE COURT:  Is it a row house?

6          MS. GRACE CONTEE:  It is a row house.

7          THE COURT:  Are you in DC or Maryland?

8          MS. GRACE CONTEE:  I'm in D.C.  I live at 925

9     (unintelligible) Northeast, Washington, D.C.  20019.

10         THE COURT:  Okay.  And so, Miss Grace, I want to

11    understand.  So, I understood that you'll be there, it sounds

12    like, for every day.  You don't -- if you need to go out, you

13    understood you have to let Miss Sarita, your daughter, know

14    that you needed to go out, you have to coordinate it.  There

15    has to be someone 24/7 in the house.  Do you understand that?

16         MS. GRACE CONTEE:  I'll be in the house 24/7.  I

17    really don't need Sarita to come every day.  But, when I have

18    to go to the doctor, because I'm in remission of cancer, is the

19    only time I really need Sarita, when I'm going to a doctor's

20    appointment.  That's seven days a week she (unintelligible)

21    because I love my child, but I don't need to see her seven days

22    a week.  I only need to see her when I need to go to the

23    doctor.

24         THE COURT:  Well, she's only talking about five days

25    a week, so we'll start with that.  But, I understand you.  And

1   so are you able to get around the house?  You know, my mom is a

2   cancer survivor as well.  So, first of all, I want to tell you,

3   I appreciate, you know, and applaud you for having to go

4   through that.  That's not -- nothing easy.  But do you have any

5   problems getting around the house or trouble with mobility

6   issues or anything like that?

7           MS. GRACE CONTEE:  Sometimes I have problems with

8   mobility, and then that's when my oldest sister

9   (unintelligible), she not (unintelligible) but my baby sister

10  come and help me in the morning.  She get there at 6 and, like,

11  she fix my breakfast for me and put a snack up for me at

12  lunchtime.  And then in the afternoon, if my bones let me go

13  downstairs and fix me something light for dinner, and then I

14  (unintelligible).

15          And I have a regular phone, I don't have that other

16  phone; I can't afford them.  I just got a regular Verizon

17  phone.  It don't call nowhere but in the District and it's not

18  hooked up to no internet or nothing (unintelligible) paying for

19  that one.  And I just basically stay in my room.

20          THE COURT:  Okay.  And what about -- who comes and

21  visits?  So it sounds like your sister, your baby sister comes?

22          MS. GRACE CONTEE:  Yes.

23          THE COURT:  Who else comes and visits?

24          MS. GRACE CONTEE:  No, they don't come visit me

25  like -- nope.  I'm scared of the pandemic.  I really don't like

1   visits.  I'm being honest.

2          THE COURT:  I appreciate you.  I can tell that you

3   are, you're an honest person, that's very clear to me.

4          MS. GRACE CONTEE:  I really don't like visitors.

5   And, you know, they just -- we talk on the phone, they like

6   that.

7          THE COURT:  How about for Mr. Glover?  If he would

8   just stay there, how would you be able to -- having an

9   opportunity to speak to him, how are you able to provide -- to

10  ensure that he's able to have meals and things like that when

11  he's there?  Is he responsible or are you responsible?  How are

12  you going to set that out?

13         MS. GRACE CONTEE:  I make sure -- oh, I'm going to

14  feed -- I was raised like that, to feed.  So me and Sarita,

15  yeah, we will pull together.  The family will pull together to

16  make sure he eat.  If they -- we ain't going to do nothing

17  else.  We are going to feed him.  You're not going to starve; I

18  wasn't raised like that.  I was raised to take care of family.

19         THE COURT:  I'm sure you were.  I can see that, Miss

20  Grace.  The reason I ask is that the people that you have that

21  might come over and help, I need to know who those people are.

22  Who do you think might be coming over that could help out?

23         MS. GRACE CONTEE:  Just Sarita.  Just Sarita and

24  Debra, my oldest sister.  And that's only when I need them.

25  She's not going to come.  Debra, not my oldest sister.  Let me

1      say, I am the oldest.

2              THE COURT:  I got you.

3              MS. GRACE CONTEE:  Yeah, just me and Debra and

4      Sarita.

5              THE COURT:  Understood.  And do you understand that

6      no -- no one under the age of 18 can come over to visit the

7      house?

8              MS. GRACE CONTEE:  Yes, sir, I understand that.

9              THE COURT:  Okay.  Appreciate it.  And as I

10     understand, you're saying the phone that you have, is that a

11     phone where you can get on the internet?  Is it one that looks

12     something like this, has a screen?

13             MS. GRACE CONTEE:  Nope, nope.  A regular phone.

14             THE COURT:  What's that?

15             MS. GRACE CONTEE:  My cell phone, this phone.

16             MS. SARITA CONTEE:  You can, but Raymond can't get to

17     it because you have your phone.

18             MS. GRACE CONTEE:  My phone.  Oh, he can't use my

19     phone.

20             THE COURT:  Okay.  Do you have a password on there?

21             MS. GRACE CONTEE:  This my cell phone.

22             THE COURT:  Okay.  I got you.  And are you able to

23     put a password on that?

24             MS. GRACE CONTEE:  Yeah.  Yeah, I got a password.

25     Yes.  I'm sorry, yes.  I'm sorry.

1          THE COURT:  You're fine, Miss Grace.  You're fine,

2     don't worry about it.  And so, in terms of -- maybe I can ask

3     Ms. Sarita a couple more questions.

4          Miss Sarita, one thing I had in another case where

5     someone was released, was that we were able to take the door to

6     their bedroom off.  You know, you have the hinges on the door.

7     Is that something that you're able to do in this instance?

8          MS. SARITA CONTEE:  My mother -- half of my mother's

9     doors is off the hinges at her house because she

10    has (unintelligible).

11         THE COURT:  Are you able to take the door off to the

12    room that you're proposing to put Mr. Glover in?

13         MS. SARITA CONTEE:  Yes, we will.

14         THE COURT:  There's no internet?  You're confirming

15    there's no Wi-Fi or anything like that?

16         MS. SARITA CONTEE:  No.

17         THE COURT:  You have a smart phone as well, I assume?

18         MS. SARITA CONTEE:  I have my own phone, but my smart

19    phone be with me 24 hours a day.  And Raymond will not -- and

20    we have spoke about this before, and he will not be able to use

21    my phone for no apparent reasons at all.  I will actually leave

22    my phone at home, if need be, when I goes to my mother's house

23    to sit with Raymond.

24         THE COURT:  Okay.  Understood.  So you wouldn't each

25    bring your phone with you, is what you're saying.  Okay.

1          MS. SARITA CONTEE:  I'm -- if that's what it takes,

2    I'm willing to do, Your Honor.  I'm willing to do whatever it

3    takes, abide by all rules to make sure that Raymond comes home.

4          MS. GRACE CONTEE:  We don't play.

5          THE COURT:  I see that, Ms. Grace.

6          Miss Sarita, you're all right.  She's all right.

7    Miss Grace, I see and I hear you.  I'm sure you understand,

8    this is -- you have to understand, Mr. Glover is -- I can tell

9    that you're a person from a generation where people don't play

10   around and you follow the rules.  I understand that.  I've got

11   a grandmother, as well as a mother, and I understand very well

12   what you're saying and where you're coming from.  I just have

13   to be very careful.

14         I'm sure you understand, we're talking about our most

15   vulnerable population here.  You have to understand, Mr. Glover

16   is presumed innocent.  We can't say that enough, neither me nor

17   my colleagues.  If we didn't believe that, we couldn't do this

18   job.  I say that in every hearing and I mean it.  It is, in

19   fact, accurate, that Mr. Glover is presumed innocent.  But I

20   still have to be very, very careful because I have to think

21   about the most vulnerable population.  And you can love

22   Mr. Glover -- you know, I've had family members who have been

23   incarcerated, and so I understand that you can love somebody

24   but still be concerned about what they've done, but it's hard

25   sometimes to believe that.

1          So here, with Mr. Glover, we're not getting into any

2     of those issues, again, because he's presumed innocent.  But I

3     still have to weigh the evidence.  And I tell you, the evidence

4     that the government has put forward, including statements that

5     Mr. Glover has made, does give me concern.  But as you heard

6     Mr. German said, what I'm striving for is not perfection.  I

7     have to look for if there's any reasonable conditions that I

8     can see, conditions that can reasonably assure the safety of

9     the community.  So that's what I'm trying for here.

10          So I want to hear from you, Ms. Sarita, is there

11     anything I need to know about your home or things -- what are

12     ways that we can make sure, if we are to release Mr. Glover,

13     that we can make sure that this -- that we can try to

14     reasonably ensure the safety of the community.  Because it's

15     your community, you're living there, and you understand that

16     it's our community in general, thinking about children.

17          So, anything else you think I need to be thinking

18     about or something you want to tell me about, Ms. Sarita?

19     Anything on your end?

20          MS. SARITA CONTEE:  One thing you can know for sure,

21     we're not going to purger ourself and put ourself -- me and my

22     mother is not going to go to jail for nobody, that's one thing

23     for sure.  Number two, if Raymond was to be released to the

24     house, he will be watched.  I mean, we going to make sure, and

25     I'm pretty sure right now Raymond has had time to think, as

1   well, that that's not somewhere he want to be.  So I know for a

2   fact that if you -- when you do (unintelligible) if you do

3   release Raymond, I'm pretty sure that he will abide by all

4   rules and regulations to make sure that there's no hiccup on

5   his side or our side to place him back where he does not want

6   to be.  I know Raymond all my --

7           THE COURT:  Yeah, go ahead.

8           MS. SARITA CONTEE:  I know Raymond all my life.

9   Raymond is not a bad -- you know, Raymond is not a bad person.

10  Before all this happened, Raymond helped me, help me raise my

11  kids.  My kids are 30 -- you know, they age from 20 on up to

12  30-something, and he helped me with all of my kids.

13          So, Raymond is not a bad person, and I'm pretty sure

14  that's not where he want to be.  So I know for a fact he will

15  abide by all rules and regulations in order to be released.

16          THE COURT:  Okay.  And you understand that if he were

17  to violate any condition, even if it's something trivial, you

18  know, like whatever might it be that you might not think is

19  that important, you would be obligated to dial 911, let the

20  police know, let the pretrial services know, and understand

21  that you will be the person, Miss Sarita, that would be getting

22  him locked up.  Do you understand that?

23          MS. SARITA CONTEE:  I know Raymond can hear us on the

24  call as well, and he know I'm not going to mess it up.  He know

25  for a fact I'm going -- I'm going -- like I was explaining to

1    the -- I am a 100 percent realist.  If you mess up, you going

2    back to jail.  He already know.  And if I have to be the one to

3    pick up the phone and call it, I will do.

4              THE COURT:  Got you.  Thank you.

5              Ms. Grace, I have the same questions for you.

6    Anything that you want to add or anything I need to think about

7    Miss Grace?

8              MS. GRACE CONTEE:  Excuse me.  My dogs got -- hold on

9    one minute.

10             Raymond, (unintelligible) raised him with his

11   parents, as far as (unintelligible) and his bothers and

12   sisters.  And Raymond know I'm not going to play with him.

13   Raymond know I'll be the one, I'm not going to (unintelligible)

14   I'm (unintelligible) there will be no violations.  If he have

15   violations, I'm going to text you.  I'm going to text you to

16   let them know.  You know, there's a curfew in my house.  So,

17   9 o'clock.

18             At 8:30 anybody visiting him needs to catch the bus

19   by 8:30 (unintelligible) in my community at 9.  I do not

20   (unintelligible) over my house.  Really, I don't, because I

21   asked them (unintelligible), I think they need some air.  I let

22   them know that, being truthful.

23             And I'm sad to see Raymond in this predicament he in.

24   I don't know what made him do it, I don't know what -- I don't

25   know.  I can't really wrap my head around it to see

 1    what's going on.  I can't stress myself out, worry about what's
 2    going on.  All I can say, as the aunt, I'm here.  Whatever I
 3    can possibly do to help.  That's all I know.  It took me a
 4    minute to come around.  I had to ask the Lord to tell me the
 5    right direction.  What the Lord told me was, when that attorney
 6    called me, was not being angry and (unintelligible).  So that's
 7    what I'm doing.  I'm reaching out to him.
 8          The only thing I -- anything he does to violate his
 9    conditions, he's gone.  I don't like jail.  I've been locked up
10    in my lifetime; never again.  And I think I was in my 20s.  I
11    lost ten pounds overnight, so I know jail ain't for me.  And I
12    can tell you that's being truthful.
13          THE COURT:  Okay.  I believe you.  I got you,
14    Ms. Grace.  I appreciate you and I appreciate your desire and
15    Ms. Sarita's desire to help.  No matter what decision I make, I
16    want to tell you, I really do admire your courage and caring to
17    step up here.  A lot of people wouldn't do it.  You see a lot
18    of people come through court, a lot of people have family, be
19    they rich, poor, somewhere in between, but a lot of people,
20    suddenly they get quiet when someone needs help in a hard way
21    like this.  And so, that really speaks so much of you and the
22    people that you are, that you care enough to come forward.
23          I have to hear from the government before I make any
24    decision.  And I may come back and ask some additional
25    questions for you.  I want to make sure, one last thing you

1   understand, if I were to release Mr. Glover, he would be on

2   home confinement.  That means he would not be able to leave the

3   house at any point.  Do you understand that?  Not even for

4   fresh air or to take the garbage out.  You got that?

5          MS. SARITA CONTEE:  Yes, we understand.

6          THE COURT:  Okay.  You two can come back on mute.  I

7   may come back to you in a bit here.

8          Ms. Russo, there's a couple things I want to

9   highlight first, and then I'm happy to hear any thoughts or

10  issues you have.  One is that -- maybe you have heard, in

11  another case, *Tipton*, I did release him on very strict

12  conditions.  Mrs. Larson appealed that to the district judge,

13  and I think that was with Judge Boasberg, although then the

14  case was subsequently indicted with Judge McFadden, so I'm not

15  sure how that's resolved.  But I have, in another situation,

16  released someone with a similar charged offense.

17          I want to highlight a couple things that matter to me

18  there.  I do appreciate -- as you know, these are crimes that I

19  was -- when I was a prosecutor I did prosecute, so I do

20  appreciate the gravity of what has been charged here.  I

21  appreciate the risk to, as I said, the most vulnerable

22  population.  And so I don't mean -- I think, you know, your

23  original pretrial detention memorandum, as well as the motion

24  for reconsideration, highlights -- the type of content is

25  truly -- what's alleged here is horrific.  It is -- if proven

1    beyond a reasonable doubt, something that I'm sure the district

2    judge will take very serious at sentencing; I think the

3    sentencing guidelines reflect what -- the age of the victims

4    and the content that is described here, because it is back --

5    as described, it is something that is more severely punished.

6    And so I don't need to hear about how bad this crime is, I

7    understand that, and how vulnerable the population is.

8            I would credit you, Mrs. Russo, I understand why

9    Mr. German is -- maybe he feels like it's a little

10   inflammatory, bringing up the pipe bomb situation, I think.

11   But I will credit you.  What I don't hear from the government

12   in this situation is what will happen if someone is on pretrial

13   release.  Too frequently all I hear is that -- how terrible

14   this crime is, and I've already got that.  I understand that.

15   I need to understand what happens if I release someone.

16           So I did appreciate that -- you bringing in case

17   examples of instances where someone has been released with

18   similar offenses and what exactly could happen.  So what I

19   would like to really drill down on, to the extent that you can,

20   is -- I understand the proposed conditions here, which is that

21   there's a home with no Wi-Fi, a bedroom with no door on it, a

22   third-party custodian that is there 24-7 in the room next door,

23   and that an additional third-party custodian that is there,

24   essentially, close to 40 hours a week and able to provide

25   support as needed and that there are no internet-accessible

1    devices that are in common spaces, there's only one smart phone

2    that the one custodian has, and the second custodian has

3    offered to keep it with them or else not bring it into the

4    residence.  And there's an understanding that children are not

5    available, permitted to come into the residence at any time.

6         The case examples you gave me, I agree, are petty

7    helpful.  I feel that this is far more restrictive than

8    anything there.  And, so, I would be interested to hear how you

9    think or what you think might, sort of, be the concerns I have

10   to think about.  Because, I'll tell you, one last thing,

11   Ms. Russo, what happened to me in *Tipton*, and what I think

12   about as I think about these cases, I think Mr. German has made

13   a good point and it does resonate with me, is that there has to

14   be some conditions for some defendant somewhere with this crime

15   where they could be released into the community; some form of

16   conditions.  Because, if not, I think that Congress would have,

17   A, legislated that and said there's mandatory detention, or, B,

18   we should never release the person because then they'll always

19   be a threat to the community.

20        And I do think that, to me, the concern where someone

21   is not producing content and there's no allegation of

22   production here, that I've seen, that I think the concerns that

23   will they be able -- and I want to be clear, I agree with the

24   government, that this is a supply and demand problem; the more

25   that people get onto these sites or engage in viewing this

1    content, it creates -- the demand creates the supply.  If

2    people were not looking at this, people would not be producing

3    it.  So that's what I have to mitigate.  And here, where

4    someone is not creating content, is how do I mitigate, you

5    know, and be reasonable?  Not any, but are there other

6    conditions that reasonably, in my mind, can mitigate his

7    ability to get online to a device?  And so if you -- I want to

8    hear from you, how you think that -- what are ways that he

9    could still get on to these, even with home confinement and

10   third-party custodians?  So please proceed, Ms. Russo.

11            MS. RUSSO:  Well, Your Honor, to begin with I have

12   some questions for the third-party custodians.  I think that

13   might be the best place for me to start, if that's okay?

14            THE COURT:  Sure.  Mr. German, I mean, I think that's

15   totally reasonable when we have witnesses here, custodians, we

16   would ask the questions.  So, obviously, if Mr. German has any

17   objections -- Ms. Grace and Ms. Sarita, the prosecutor is going

18   to ask you some questions.  Give Mr. German a moment, if he has

19   any objection, I'll hear from him, or else, of course, I can

20   step in.  But, I will say, I have had quite a bit of experience

21   working with Ms. Russo and find her to be pretty reasonable.

22   So, in fact that's a polite way to put it.  I think she's very

23   reasonable.

24            So, Ms. Russo, go ahead.

25            MS. RUSSO:  Thank you.  I would like to start with

1       Grace, if possible.  Grace, I second the judge's comments

2       about, sort of, the act that you're doing here, and I know that

3       it is not a small sacrifice that you're asking to take on.  I

4       wanted to ask you, how -- how old are you currently?

5              MS. GRACE CONTEE:  (Laughing.)  No, I'm laughing

6       because I do not own my age.  But 64, ma'am.  I'm 64 years old.

7              MS. RUSSO:  Thank you.  And how long have you known

8       Mr. Glover?

9              MS. GRACE CONTEE:  All his life.  I'm his paternal

10      aunt.

11             MS. RUSSO:  And would you say you're pretty close to

12      him, that you have seen him often throughout his life?

13             MS. GRACE CONTEE:  All his life.

14             MS. RUSSO:  And about how often would you say that

15      you've seen Mr. Glover before this offense happened?  Did you

16      see him on a weekly basis, a monthly basis, a daily basis?

17             MS. GRACE CONTEE:  See him -- he used to come by at

18      least once out of the month, and he call me every day.

19             MS. RUSSO:  So you know him very well?

20             MS. GRACE CONTEE:  Very, extremely well.

21             MS. RUSSO:  Did you know that he was engaged in this

22      kind of activity ever?  Did he ever tell you --

23             MR. GERMAN:  Your Honor, Your Honor, I have to object

24      to that.

25             THE COURT:  Hold on, Miss Grace.  Let me ask you

1       this, Ms. Grace:  I think what Ms. Russo is trying to get at,

2       did you know things about -- let's just say his personal life?

3       Did you have any awareness of any of that?

4                MS. GRACE CONTEE:  No, sir.

5                MS. RUSSO:  And then I wanted to ask you, in terms of

6       computers and that kind of thing, you said your phone right now

7       is not a smart phone, I think that's what you said?

8                MS. GRACE CONTEE:  My house phone is a regular

9       Verizon phone, a landline.

10               THE COURT:  I think, just to clarify, I think there

11      was some confusion.  It seems that she now indicates that she

12      has a landline and that she -- as she demonstrated, she does

13      have a smart phone that looks like it is internet accessible,

14      which she held up and said she is willing to password protect.

15      So if you have any questions about that.

16               MS. RUSSO:  So on that phone do you have any

17      applications?  Do you know what Telegram is?

18               MS. GRACE CONTEE:  What phones you talking about?  My

19      cell phone?

20               MS. RUSSO:  Do you know what Telegram is?

21               MS. GRACE CONTEE:  No.

22               MS. RUSSO:  Do you have encryption on that phone or

23      do you know what encryption is?

24               MS. GRACE CONTEE:  No.

25               MS. RUSSO:  Do you know what a VPN is?

1              MS. GRACE CONTEE:  No.  What is she talking about?

2              MS. SARITA CONTEE:  Mom, mom, just let her ask the

3    questions.

4              MS. RUSSO:  I don't have any other questions for

5    Grace at this time, Your Honor.  I actually don't think I have

6    any questions for Sarita, either.  I do need to know the

7    address, but I don't want them to say it on the record because

8    I don't want everybody in the public to know their address.

9    But I do need to check their address, I'm sure pretrial is

10   doing the same, you know, for day cares and other things that

11   might be close by.  And then I need a date of birth again.  I

12   don't need that on the record.  But I also want to make sure I

13   run a criminal history check.  And I don't have any reason to

14   believe there's any criminal history, but that's something we

15   always do.

16             So that's all on the third-party custodians for me,

17   Your Honor, in terms of questions.

18             THE COURT:  Great.  Thank you so much.  I did want to

19   hear from Mr. Copes.  I know -- Mr. German, have you been able

20   to communicate?  Mr. Copes, have you had an opportunity to do a

21   screen of the third-party custodians?

22             PRETRIAL SERVICES:  John Copes, pretrial services.

23   Yes, Your Honor, I did prescreen.

24             THE COURT:  Great.  And were they deemed eligible?

25             PRETRIAL SERVICES:  Yes.  And they were found

1    eligible for third-party custodian.  So, previously Sarita

2    Contee had children that resided at the home.

3          THE COURT:  Okay.  That's right.  So at a previous

4    hearing Ms. Sarita Contee offered, but she was unable to due to

5    children being -- residing at the home, otherwise she was

6    eligible.  And so here Ms. Grace Contee is, in fact -- you

7    did -- you know, there are no children at the home and she has

8    no previous issues that would bar her from being one, is that

9    right?

10          PRETRIAL SERVICES:  Yes, Your Honor.  There was a

11    misdemeanor charge from '80s, but deemed eligible for

12    third-party custodian.

13          THE COURT:  Okay.  Understood.  Thank you.  Anything

14    else you want to add from pretrial, in terms of the address or

15    anything else that you've encountered, in your view, of the

16    proposed third-party custodian?

17          PRETRIAL SERVICES:  No, Your Honor, nothing that

18    hasn't been brought up already in court.

19          THE COURT:  Okay.  Thanks so much.

20          Okay.  Ms. Russo, do you want to continue on with any

21    argument you have or anything else?

22          MS. RUSSO:  Yes, Your Honor.  And to sort of address

23    why I asked the questions that I did, one of the concerns that

24    the government has -- we have, according to Ms. Grace, a

25    64-year-old woman who is in remission of cancer, who is not

1    very mobile, who spends most of the time in her home, in her

2    room, and all of that is completely understandable, but, here

3    there was encryption used, there was very sophisticated

4    technological efforts made by Mr. Glover.  One of the things

5    you asked, Judge, is surely not every distribution-of-child-

6    pornography defendant is detained, otherwise there would be

7    mandatory detention, and the government agrees.

8            But there are some factors in this case that make

9    Mr. Glover more of a danger, and one of those is how

10   sophisticated he was with technology and encryption.  In the

11   chat room they talked about police not being able to catch them

12   because there were in an encrypted chat and they made fun of

13   the police.  When you have somebody like Ms. Grace -- who's,

14   you know, such a kind soul here, obviously, Your Honor -- but

15   who doesn't have Telegram, who doesn't know what that is, who

16   has no knowledge of encryption or VPNs, and who has clearly had

17   no idea that Mr. Glover was engaging in this kind of activity

18   because he lied to her for many years about, as well as

19   everybody else, which is very common with this crime, right?

20   that people are living a double life, they're extremely

21   helpful.  Like Ms. Sarita noted, in terms of him helping with

22   her children and being active in their lives and being helpful.

23   And that can be true, but at the same time, they're also

24   engaged in this criminal activity and are able to hide it from

25   the people that love them most, which is why having a third

1       party custodian doesn't necessarily mitigate that danger.

2              Mr. Glover, if he gets another electronic device,

3       would very easily be able to hide it from these two women and

4       he would be able to use sophisticated technology in a way that

5       they couldn't understand, even if he were accessing these

6       devices.  So, that's part of the concern that the government

7       has.  And I think that ties in well to Your Honor's next point,

8       with respect to some of these other offenders and why the

9       government brought them up.

10             And it is true that I don't believe any of the four

11      other offenders that I cited had a third-party custodian.

12      However, the claim that the government is making is that when

13      there's this level of compulsion, like the one that Mr. Glover

14      had -- again, something that sets him apart, even from other

15      distribution offenders -- he is watching a video of an infant

16      being abused when law enforcement knocks on the door.  I mean,

17      this activity only stopped because of the search warrant that

18      was executed, and the only way that law enforcement ever

19      learned about Mr. Glover, because he was using sophisticated

20      techniques, was because he was a part of a chat with somebody

21      who ended up cooperating with the government and so we got

22      access to a chat we never otherwise have had access to.

23             These are both things that set him apart and they

24      show that he has that same kind of compulsion as the offenders

25      I mentioned in my brief.  Why did I mention people from

1    Detroit?  Because, Your Honor, here in this District most

2    offenders charged with distribution have been detained.  There

3    aren't a huge number of examples of those that have been

4    released.  But even though they have been released, did not --

5    pretrial has never had the ability to do computer monitoring or

6    home visits.

7            And so, these offenders who are released may be

8    reengaging in this activity, but there's no way to catch them

9    in the same way that you could in almost any other district in

10   the country, because almost every other district in the

11   country, pretrial is able to do home visits, there is computer

12   monitoring, and that is paid for by the defendants, not

13   pretrial, and there's the GPS tether, the psychosexual

14   evaluation that offenders like this are required to undergo.

15   And you saw that that was part of the way that one of these

16   offenders got caught, is his evaluator -- he confessed to his

17   evaluator what he had done.

18           The ways that these four offenders got caught are not

19   ways they would get caught in our district because we don't

20   have the same -- unfortunately pretrial doesn't have the same

21   abilities as they do in other districts.  So, you can't use the

22   offenders in this district as an example, you have to go

23   elsewhere.  These are all four cases that I personally handled

24   in some way, in some capacity.  And I will tell you, they're

25   very -- four -- very few cases I've had release granted on, and

1    yet in all four -- I would say I would have probably less than

2    eight of this kind, where there was a release, and I have about

3    a 50 percent rate of recidivism on pretrial release.  So it's

4    not -- it is extremely high, the fact that this many of these

5    offenders did something while on pretrial release.

6           Okay.  A couple of other things about this particular

7    case that are concerning to the government.  In 2012 and then

8    again in 2012 -- in 2020, the Sentencing Commission issued

9    reports about distribution, receipt and possession cases,

10   non-production offenders, and in both 2012 and 2020 the

11   Sentencing Commission noted that there were some things about

12   these cases that suggested perhaps some of the sentencing

13   enhancements traditionally used were outdated.  One of them was

14   the use of a computer enhancement.

15          At the same time, the Sentencing Commission

16   recognized that there was a certain class of offenders who were

17   distributors, receivers and possessors of child pornography who

18   they felt additional enhancement should be applied to, and that

19   those kinds of offenders were especially concerning.  And two

20   of the categories that they discussed as potentially deserving

21   an additional enhancement as particularly dangerous offenders

22   are present here.  One of those is engagement with other

23   offenders about abusing children.

24          This offender, Mr. Glover, was in at least three

25   different groups on this encrypted Telegram in which he was

1    communicating with other offenders about abusing children.  And

2    they were exchanging child pornography and he told them he was

3    a true dad.  And this is very concerning to the government, and

4    clearly something even the Sentencing Commission has recognized

5    puts someone in a different sort of class of dangerousness.

6           The second thing the Sentencing Commission recognized

7    that is present in this case was that these kinds of offenders

8    who save child pornography to multiple different kinds of

9    devices and cloud storage accounts are particularly dangerous.

10   And here, we have Mr. Glover who had child pornography on

11   Google Drive, Telegram, Dropbox, MEGA, his laptop, and his

12   iPhone, at a minimum, Judge.

13          So, again, this is not just any distribution of child

14   pornography case.  There are red flags that have been raised

15   here that have been recognized by both Congress and the

16   Sentencing Commission as factors in terms of dangerousness.

17          In terms of some of the other things that we look at

18   when we're looking at these kinds of cases, I think there's two

19   dimensions of risk if we were to allow Mr. Glover to be

20   released, and the first is that he re-victimizes children by

21   distributing, receiving or possessing child pornography, and

22   the second is that he touches a child.  Right?  Those are the

23   two dimensions of risk.

24          And Your Honor talks about how the government

25   repeatedly emphasizes how serious this offense is and how Your

1    Honor understands that.  And I hear that.  But, I have to say

2    that I think one of the problems that we have when it comes to

3    these kinds of offenses -- and multiple circuit courts have

4    noticed this and remarked on it -- is that the conduct is so

5    egregious and so horrible that in describing it we tend to

6    sanitize the way that we describe it.  It tends to seem like

7    the government is inflaming passions when they describe a video

8    or image.  And that -- as the circuit courts, particularly the

9    Fifth Circuit, have noticed and flagged -- is actually the

10   opposite of what's happening.  Right?

11         The offender has committed a particular type of

12   offense.  If the government were to show the video or an image

13   in a detention hearing, it would be considered like, oh, I

14   can't believe the government is doing that, they're inflaming

15   passions.  But this is what the defendant actually did.  And I

16   have to say that, you know, the fact that none of us wants to

17   see or hear about the videos and images because it's too

18   horrifying to us and we feel so -- that it's so distasteful is

19   something that is particularly important, because when I

20   watched just a few seconds of one of these video it makes me

21   sick, it makes me want to vomit.

22         These children are being re-victimized when I'm

23   watching it, children that were abused in their most vulnerable

24   moments, and now complete strangers are not just watching their

25   videos, but actually enjoying them and sexually gratifying

1    themselves based on these videos.  And when have you an

2    offender like Mr. Glover, who's communicating with other

3    offenders in a community, they play off of each other, Your

4    Honor, and that is what leads, sometimes, to production, which

5    is these offenders share videos that are increasingly,

6    increasingly horrible, and then they say, I have access to a

7    child, I'm going to do what I saw on the video to this child in

8    the group.

9          So even if Mr. Glover doesn't ever produce child

10   pornography, he provides inspiration to other offenders to do

11   the same, which drives this marketplace for abuse of children.

12   And I have to also say, that every single child that Mr. Glover

13   had videos or images of, we're going to submit that to the

14   National Center for Exploited and Missing Children, and every

15   single child that's actually identified is going to receive a

16   notification that another stranger, another pedophile, another

17   person they've never met has been looking at their images and

18   videos and sexually gratifying themselves by doing so.  These

19   people, some of these children are now well into their careers,

20   they're lawyers, they're doctors, they're accountants, and they

21   are getting these notices and it is a harm to them, and I think

22   we can't ignore that part of this.

23          And, so, that's why, when you look at an offender

24   like Matthew Johnson, who pretrial didn't catch and who was

25   engaging in just looking at images and videos for four or five

1    months, the government would submit to you, Your Honor, that if

2    you believe that there's any risk that Mr. Glover would look at

3    any additional child pornography of any additional child, that

4    that is not a risk worth taking and that you should detain him,

5    if there's any risk of that, because the harm is so great.

6         The second thing that I would like to talk about is

7    the harm or the potential to actually touch a child, the second

8    dimension of risk.  And I will say here, Your Honor, is just

9    that -- I think that we often forget that somebody who's

10   looking at these videos and looking at these images, that

11   they're spending those hours doing it, that that activity is

12   something that we can take into account.  Just like if I spent

13   hours every single day looking at recipes, right?  If I came

14   home from work and for three to four hours a day I was looking

15   at all different kinds of recipes, every single day, well, I'm

16   likely not doing that because I just want to look at recipes.

17   I'm likely going to cook a meal at some point based on one of

18   those recipes.

19        And I think that there's multiple studies and

20   multiple different people who are psychosexual evaluators that

21   said a defendant's collection is the best predictor of what he

22   wants to do.  Whether he acts on that or not, it's the best

23   predictor of what he wants to do.

24        And here, Mr. Glover's collection, again, even

25   amongst distribution of child pornography defendants, was

1    particularly egregious; very young children, infants, toddlers.

2    The video he was watching when law enforcement hit his door

3    involved a toddler or infant, Your Honor, being raped.  And in

4    the chats that I was in, they were talking about

5    (unintelligible), about young infant, toddler children being

6    abused and raped.

7         And, so, for all those reasons -- I agree, Your

8    Honor, not every distribution of child pornography offender

9    needs to be detained, there are some that, with these kinds of

10   conditions that could be imposed in this case, would be safe in

11   the community.  But that's not Mr. Glover.  And I would urge

12   the Court to maintain the earlier ruling and continue pretrial

13   detention in this case.

14        THE COURT:  Thank you, Miss Russo.  Thank you.  I

15   appreciate how you handled your inquiry and the questions all

16   seem relevant to me.  So, thank you for your professionalism.

17        Mr. German, I want to just really drill down -- in my

18   mind, what the government has stated -- and I understand their

19   arguments for risk and I don't think I need to hear from you in

20   terms of actual direct harm, first person harm of a child

21   because I think you covered that at the previous hearing and,

22   as you said in your papers, why you don't think Mr. Glover is a

23   risk for that.

24        And so, really, I'm just focused on -- to be clear, I

25   agree with you, I think that there are conditions or a

1    combination of conditions that can preclude him from being a --

2    that can reasonably assure the safety of the community from

3    direct contact with children.  What I need you to focus in on,

4    and where I think my decision hangs upon, is that although

5    Mr. Glover has no criminal history, he seems to be

6    sophisticated in using sophisticated technology in the, sort

7    of, ways that he accesses these -- this content.

8              And so, why doesn't that distinguish this case from

9    one where someone was just simply, you know, getting on their

10   Gmail someone sent to them, this -- allegedly sent this

11   content, they looked at it, whatever, you know.  Isn't that

12   different than where someone uses Telegram, MEGA, Upload and

13   these other different sites, and is able to do it in such a

14   discrete fashion that not only does not law enforcement know

15   it, unless they were, you know, as they were lucky here, they

16   indicate, through a cooperator or, you know, however they got

17   turned into this.

18             So not only did law enforcement have the difficulty

19   perceiving it, we know that pretrial doesn't do visits, they

20   won't monitor.  In addition, there's concerns that the

21   third-party custodian has already stated that both are -- you

22   know, at least one is unaware of what these applications are,

23   so they wouldn't even know to look for it.  So I just really

24   want to focus on that issue.

25             Ms. Sarita, I want to hear from Mr. German and then

1    I'll come back to you in a minute.  But, I want to hear from

2    him.  Go ahead, Mr. German.

3              MR. GERMAN:  Thank you, Your Honor.  I think, for me,

4    the issue is that -- what I mentioned earlier.  What the

5    government is asking for, the right of the Court to ask the

6    wrong question.  Again, we're not here to try to figure out,

7    again, what random condition -- or, what random situation they

8    can come up with where Mr. Glover violates his conditions of

9    release.

10             The fact of the matter is here that there are no

11   devices besides one smart phone in this house.  There is no

12   internet.  Right?  Sure, is there a world in which Mr. Glover

13   can get his hands on a phone?  Absolutely.  But again, in any

14   case there is going to be some random situation where we can

15   come up with a -- the government can come up with where the

16   person violates their conditions of release.  And I think here,

17   again, what we're looking for is what reasonable assurances we

18   have.  And I think we do have a place where there's no internet

19   and only one device.  And there's no, absolutely no reason to

20   believe that that person is going to allow themselves to put --

21   they know the danger they're putting themselves in if they

22   allow Mr. Glover to touch that device in any way.  So, they

23   have an understanding of that.

24             So I think that we don't need to start thinking

25   about, you know, can Mr. Glover download Telegram on

1    Ms. Contee's phone or something like that.  I think that is a

2    farfetched idea.  And, again, when we -- if our approach to a

3    detention hearing is only that, is what -- well, what can we

4    come up here, what conditions or what situation, you know, is

5    the person going to violate their condition of release, we're

6    never going to release anyone.  That's just the reality.

7           So, again, I think that is the -- that's just the

8    wrong question to be asking here, Your Honor.  I just don't

9    think -- you know, I certainly understand, you know, if we were

10   proposing a home with internet or multiple devices, and even in

11   those cases, Your Honor knows that -- what my position is.

12   But, I think here, you know, the ability to even try to get

13   online or anything like that is significantly diminished, Your

14   Honor.  I think that really has to be taken into consideration

15   when we are thinking about the -- what the government is saying

16   here.

17          THE COURT:  Ms. Sarita, I'm happy to hear from you,

18   although I want to be clear that we're not here to talk about

19   Mr. Glover or the things that he may or may not have done.  If

20   there's something you think I need to know about your ability

21   or your mom's ability to be a third-party custodian, that's

22   what I need to know.

23          You're on mute, Ms. Sarita.

24          MS. SARITA CONTEE:  No, I'm fine.  Thank you.

25          THE COURT:  All right.  I'm going to take a few

1    minutes.  I'll be -- you can go on audio and video off of

2    camera.  I'm going to go, and I'll reconvene here in about five

3    minutes.

4            (Recess.)

5            THE COURT:  Okay.  Everybody, the internet camera is

6    back on.  We're going to recall the case now.

7            I've had an opportunity to continue to review the

8    pleadings and the arguments by the parties.  And as I think

9    about this, I think, as I indicated, what I have to think

10   about -- and I disagree with the government, that it's not any

11   risk, it's whether or not there are conditions or combination

12   of conditions that can prevent -- that cannot be imposed to

13   prevent a -- you know, reasonableness.  I think about the

14   conditions or combination of conditions that can reasonably

15   assure safety of the community.  Right?  So I'm not thinking

16   about any risk, I'm thinking about how can I reasonably ensure

17   the safety of the community.  And I think Miss Russo makes some

18   good points about why this case -- you know, it distinguishes

19   this from the average, what you might say the prototypical case

20   where we have to think about where release would be

21   appropriate, because she's talking about encryption in

22   particular, and she highlights that there's sophistication

23   there that may not be in other cases.  So, that is the main

24   argument that I consider as I go through this.

25           I have some additional questions for the third-party

```
1     custodians and then I will let you know how I rule.

2              I will -- I want to be sure that I'm clear on this,

3     though.  So, Ms. Sarita, if you can unmute again, please.  Ms.

4     Sarita, can you hear me?  I need you to unmute.

5              MS. SARITA CONTEE:  Yes, I'm here.

6              THE COURT:  Okay.  So I want to understand, you're

7     indicating that you would be there Monday through Friday?

8     Again, from about 9 to 4 p.m. every day, is that right?

9              MS. SARITA CONTEE:  Eight.  From, like, 8 to 4.

10             THE COURT:  You understand you have to be there every

11    day?  You're making a promise to me that you're going to be

12    there every day, that's what you're saying?

13             MS. SARITA CONTEE:  Yes, sir.

14             THE COURT:  Okay.  If I also order you -- and I'll

15    ask Ms. Grace after you -- if I order you once a day to go

16    through and search -- and I mean, you know, like how the police

17    does it; go through and turn upside down a room and look

18    through everything, including on the defendant.  Is that

19    something that you would do every day, if I ordered you to do

20    that?

21             MS. SARITA CONTEE:  Yes, sir.

22             THE COURT:  And that means, also, if I ordered you to

23    do that on the weekend as well -- which means, I know you said

24    you weren't planning on going there, but you could find a half

25    hour, an hour to get there every weekend, you could do that?
```

1          MS. SARITA CONTEE:  Yes, sir.

2          THE COURT:  Okay.  And you understand that while

3     you're there, before any person could enter the residence, you

4     would have to both confirm that they are not a minor, and then

5     in addition, I would want you to search them and take off any

6     device that was on them.  Is that something that you would be

7     willing to do?

8          MS. SARITA CONTEE:  Yes, sir.

9          THE COURT:  Okay.  Now, I have a question for your

10    mom.  Before I ask her, I want to understand, also, if you

11    could help her, Ms. Grace; she may need some technical help

12    with this.  Miss Grace, I have questions for you, the same

13    questions I asked your daughter.  Are you going to be willing

14    to search your son (sic) and are you physically able to search

15    your son's (sic) -- the room that he's in once a day, without

16    telling him, go in there, and I mean turn the whole room upside

17    down and make sure there's no phone or laptop, computer,

18    anything, video game system, anything in there that he could

19    use.  No electronic device.  Is that something you're willing

20    to do?

21         MS. GRACE CONTEE:  Yes, sir.  I used to be a monitor

22    at the homeless shelter, so I do search, thorough searches.

23         THE COURT:  Okay.

24         MS. GRACE CONTEE:  They got -- it will be in the

25    closets -- well, there ain't going to be no door anyway on the

1    closet.

2              THE COURT:  Okay.  And you understand that when

3    someone comes into the residence, that that is something in

4    addition?  When anyone comes in your house, you got to make

5    sure that they're over 18 years old and then no matter what age

6    they are -- I don't care if it's someone you've known your

7    whole life -- you need to search them and make sure -- after

8    they give you a device, make sure they don't have one on.  So

9    they can tell you, hey, I have one phone, and then you tell

10   them:  Open your pockets, open your backpack; I need to look

11   through this, and make sure that they don't have any device; a

12   laptop, an iPad, a camera, something else, that you have to

13   take possession of it and hold onto it the entire time that

14   they're there.  Do you understand that, Ms. Grace?

15             MS. GRACE CONTEE:  Yes.  Yes, sir.  I understand

16   that.

17             THE COURT:  Okay.  Now, the one last question I have

18   is that on your phone there is an option that after 15 failed

19   login attempts -- looked to me like you had a Google or

20   Android-based phone, that after 15 attempts it automatically

21   wipes the phone and deletes everything off of it.  So I'll ask

22   Ms. Sarita, is that something where you can go in and -- into

23   the settings -- I've looked at it online, it's fairly easy to

24   find directions how to do it.  You go to settings, lock screen,

25   tap on secure lock settings, you enter your current password

1    and then you enable auto factory reset.  Is that something that

2    you would be willing to work with Ms. Grace, to put that on her

3    phone so that someone can't just sit there and try, hour after

4    hour, and just doing a hundred passwords?  Is that something

5    you can do, Ms. Sarita?

6              MS. SARITA CONTEE:  Yes.

7              THE COURT:  Do you feel pretty comfortable -- do you

8    understand how to use smart phones?  Do you understand the

9    different ways to access the phone, unlock it, so you

10   understand how to use it?

11             MS. SARITA CONTEE:  Yes.

12             MS. GRACE CONTEE:  Yes.

13             THE COURT:  Okay.  I understand.  Thank you.  And

14   then, the -- in terms of that, Ms. Grace and Ms. Sarita, if you

15   can also work to make sure -- you need to make sure the option

16   on your phone that has a password feature where it can be --

17   one were it can be four characters, or six, at least.  I want

18   to make sure that you're confirming that you will change your

19   password to a six character password.  You will not write it

20   down anywhere.  You have to memorize it.  And then it has to

21   have at least one special character, like an exclamation point,

22   an @ sign -- you know, a character, not just the letter -- and

23   at least one number.  Is that something that you're willing to

24   do, Ms. Grace and Ms. Sarita?

25             MS. SARITA CONTEE:  Yes.

1          MS. GRACE CONTEE:  Yes, sir.

2          THE COURT:  Okay.  Thank you.  Okay.  Well, based on

3     the statements from the third-party custodians and their

4     understanding of the gravity of it -- I will also note that I

5     think that's an important factor, that Ms. Grace has been a

6     monitor in a homeless shelter in the past and indicates to me

7     that she has some expertise in this -- I do believe that there

8     are conditions or combination of conditions that can mitigate

9     the harm that Ms. Russo has raised.

10          I think that she's right, that there is always some

11     risk.  But I can't -- I'm not here to mitigate some, I have to

12     just find if they're reasonable -- conditions that can

13     reasonably assure the safety of the community.  I think that in

14     a situation in which there is no Wi-Fi in the house, there is

15     only one device -- this is truly atypical from anything else

16     I've seen in these cases where there is use of multiple

17     devices, there is home-based Wi-Fi.  And here, where we do not

18     have that, I think that that is, to start with, an enormous

19     difference.  And then adding on that, a third-party

20     custodian -- although she does have health issues and it does

21     give me some concern -- but I think there is additional support

22     from a second third-party custodian who is agreeing to be there

23     40 hours a week during the week and that, in addition, to make

24     visits on the weekends, I think these will sufficiently

25     mitigate those concerns.

1             I think the real concern is:  Can the defendant get a

2     device?  And I believe that there are conditions or combination

3     of conditions that could not only prevent him from getting a

4     device, I think it's unlikely that he will get a device.  And I

5     do think that if he were to get one, the third-party custodian

6     would warn, immediately, law enforcement of that, such that he

7     would be subject to detention.

8             I would note, in addition, I think that Mr. Glover

9     being currently detained at CDF and now at Lewisburg, for

10    someone who has never had any criminal history, I think that's

11    doubly important.  One, I think his lack of criminal history

12    has to inure to his benefit.  It reflects that he is not

13    someone who has repeated violations with the law.  And for

14    someone who is presumed innocent, it makes me believe that he

15    can follow directions, that this was a mistake, even if it was

16    a longstanding mistake for a period of time, it is his first

17    offense.

18            And I think that the *Munchel* decision reflects that

19    we have to look at particularly a person's criminal history.  I

20    do think that it's not quite as nuanced -- or, it's not quite

21    as simple, there is some nuance to it, and this is not someone

22    who just went, on one day, and appeared to have conduct that

23    was an aberration.  It does look like there was planning

24    involved in this and that there was some time that went into

25    it; it was not just a one-off.

1          That being said, I still consider the lack of

2     criminal history as important because it reflects to me that

3     they can follow directions when told by a Court.  I think --

4     so, that is the -- I think that's particularly important.

5          The second part of the lack of criminal history

6     that's important is that Mr. Glover has never been detained

7     before.  He has seen what I would agree are horrific conditions

8     at the central detention facility, and that is in Lewisburg.

9     No matter how good or bad it is, it is still a jail.  And so I

10    believe, of anyone, he is particularly well-placed to

11    understand that he -- what he faces, were he to violate any

12    conditions, he would go back to being detained, potentially at

13    CDF, under conditions that his lawyer has described horrific,

14    and that I agree are in fact -- were horrific.  Or at

15    Lewisburg, which, again, I'm sure there could be problems

16    there.

17         So, Mr. Glover has some very large deterrent because

18    he's actually walked through a jail cell and been forced to go

19    through that process, to understand the indignities of it and

20    what would happen to him if he violates.  So I think that that,

21    in fact, is an important factor that I consider.

22         I want to go over the conditions of release I have

23    and then give Ms. Russo the opportunity, if she seeks, to seek

24    a stay and appeal.

25         The conditions of release will be home incarceration.

1     This is in fact the most -- Ms. Grace and Ms. Sarita it's

2     important that you listen to the conditions of release that I'm

3     releasing Mr. Glover to because I'm going to ask to make sure

4     you understand it all.  I'm going to send Mr. German a copy of

5     those conditions of release to then send to you, so that you'll

6     have them in writing, as well.  But I need to make sure you

7     understand all of them.  If you do not understand them, you

8     must ask me a question and we will figure out together.  So you

9     can please unmute again, Miss Sarita.

10            So the conditions of release are home incarceration.

11    It is the most strict form of detention.  That means that

12    Mr. Glover is not permitted to leave the residence for any

13    reason, other than to go to court or for medical appointments.

14    He must first inform pretrial.  He cannot go to them, a court

15    hearing or a medical appointment, without first informing

16    pretrial services that he is so doing, and that they then

17    permit him to do so.  So, he can't just say, I'm going to court

18    so I need to -- I need to get out of the house.  You cannot let

19    him out of the house under any conditions until you speak to

20    his pretrial services officer and you understand that they have

21    said he is permitted to leave.  That means he cannot leave to

22    go -- to take out the trash.  He cannot step outside to smoke a

23    cigarette.  He cannot leave the house.  It is as if he's in

24    prison, the prison is simply here in Ms. Grace's home.

25            So that is home incarceration.  It is the most strict

1    form.  He will be on an ankle monitor.  That ankle monitor will

2    be monitoring his location to make sure that he does not leave

3    the residence.  He must in fact -- he must make sure that he is

4    wearing the ankle monitor at all times and he does not take it

5    off.  He is not permitted to do so.

6          He must not have any access to any phone or any

7    communication device of any kind.  He shall not have access to

8    any electronic device that could access the internet.  I

9    understand that you don't have internet.  You are not to get

10   internet at any point while he is staying there.  You are not

11   permitted to go and get new Comcast service or any other

12   Verizon service of any sort.  He is prohibited from accessing

13   any device that can access the internet or it can be used to

14   share images.

15         He may only use a phone to talk to his lawyer while

16   you are present in the room and -- or to engage in pretrial

17   services, you have to be present in the room at that time,

18   while he's engaged in conversations with his lawyer or while he

19   is dialing in using Zoom, just as you are now, for any

20   hearings.  You must be present at all times and monitoring him

21   to make sure that he is not at the same time accessing the

22   device to engage in any sort of other activity.  I don't care

23   if it's to look at shopping or to look at any other thing.  He

24   can't do that.  All he can do is speak to his lawyer, and he

25   needs to stand back from the phone, as you are doing now, and

1    make sure that he is not trying to multitask on the phone to do

2    something else.

3             He's to engage in any treatment services as directed

4    by PSA.  PSA is to notify the defense counsel, as well as the

5    government, when they want him to have -- if they seek to have

6    him engage in any sort of treatment of any kind.  The

7    third-party custodian must be present for any of those that are

8    to be conducted.  They shall not be conducted in person.  They

9    could be only remote, and the third-party custodian, at least

10   one, must be present for all times of that.

11            Any of the defendant's -- sorry.  I want to now focus

12   on the third-party custodians and the conditions that

13   Ms. Sarita Contee and Miss Grace Contee must engage in, and to

14   which they will swear under oath.  They must monitor the

15   defendant in accordance with all of the conditions of release

16   that are in the written orders and that I state here orally.

17            They must keep their phones -- Miss Grace Contee, you

18   can have your phone on you, as long as -- we'll get here in a

19   minute to discuss the password -- but you are allowed to have

20   your phone and bring it with you because I want you to believe

21   able to communicate with your family.  But you are never to let

22   it leave your presence.  You have to keep it on you at all

23   times; the same for Ms. Grace Contee as Miss Sarita Contee.

24   Both of you must have your phones on you at all times.  When

25   you go to bed, I don't want -- you know, you have to have it

1    right there with you, on your person, either in your pocket or,

2    if it's plugged in, right next to you so that -- right next to

3    your hand.  So, like, not more than, let's say, three feet away

4    when you're asleep.  But when you're awake, at all times it has

5    to be on you.

6              MS. SARITA CONTEE:  Excuse --

7              THE COURT:  And, Ms. Grace, you have a question?

8              MS. SARITA CONTEE:  I'm sorry.  It was me.  My phone

9    is about to die, so I was wondering, can I -- can you ask on my

10   mom's line, so I can put mine down?  We trying to connect to it

11   right now.

12             THE COURT:  You're trying to connect off the land

13   line, is that what you're saying?

14             MS. SARITA CONTEE:  No, off another cell phone.  I'm

15   trying to --

16             THE COURT:  Off your mom's cell phone?

17             MS. SARITA CONTEE:  Yeah.

18             THE COURT:  Okay.  Well, go ahead and try to connect

19   through that one first.  Okay.  You're on.  You can hang up on

20   this one.

21             MS. SARITA CONTEE:  Yep.  Thank you.

22             THE COURT:  I'm just connecting the audio.  Hang on

23   one second here.  Can you hear all right?

24             MS. SARITA CONTEE:  Yes.

25             THE COURT:  Okay.  So, you understand that you have

1    to keep the phone on you at all times when you are, in fact --

2    when you're awake?  At any time if you're asleep and you have

3    to plug it in or something, you need to keep it, only then,

4    within three feet of you; someplace where you can grab at the

5    phone.  Do you understand that, Ms. Grace?

6              MS. GRACE CONTEE:  Yes.

7              THE COURT:  Miss Sarita, you understand the same?

8              MS. SARITA CONTEE:  Yes, sir.

9              THE COURT:  Okay.  You're not to have any devices in

10   the residences that can -- are smart tablets or other smart

11   phones.  This is it.  It can just be the one phone on you and

12   the one phone on the other person.  That's it.  There can be

13   nothing else there.

14             You shall not have any computers in the residence at

15   any time, if anyone will come to -- people coming in.  But you,

16   yourself, are not to have any computers in there, and I

17   understand that you don't.  You must ensure that at least one

18   of the two of you is in the house at all times; 24 hours a day,

19   seven days of week, there must be one of the two of you.  Not

20   somebody else.  You can't ask somebody else to come be -- if

21   both of you is unavailable, you need to let the Court and

22   pretrial services know.  We'll then hold an emergency hearing

23   and see if there is another third-party custodian.  But I can't

24   promise you that that person I will agree to.  So, really, both

25   of you are committing, for the foreseeable future, 24 hours

1      day, seven days a week, one of you will be there.

2                   MS. SARITA CONTEE:  Yes.

3                   MS. GRACE CONTEE:  Right.

4                   THE COURT:  You must create new passwords, minimum of

5      six characters, for both of your phones.  Those phones shall

6      include a special character and a number, as well as one

7      capital letter and one lower case letter in that six-character

8      password.  You're not going to write that password down.  You

9      are to memorize that password, so that you and only you can

10     access your device, no one else.

11                  You're to require all visitors who enter the house to

12     surrender any electronic device -- cell phones, laptops,

13     tablets, smart watches, anything like that -- they must give it

14     to you and you are to hold it while they are in your house.

15     You must also search them to ensure that they have no other

16     devices or that their person does not, their backpack.  They

17     may have forgotten that they are carrying something with them.

18     So it's not to say that they're lying, but you are my eyes and

19     ears there.  You have to do what I would do if I was there,

20     which is to search them.

21                  You're not there to be polite or kind to anybody.

22     Okay?  If they're coming to your house, you're there to make

23     sure that you are not disrespecting this Court and you're not

24     disrespecting the system of justice and, more importantly, me,

25     that when I'm giving you this opportunity to do the right

1    thing, that you are doing right by me and that you are going

2    through all of their materials to make sure that they don't

3    have something.

4            You must, every day, both of you -- so twice a day,

5    separately, not at the same time, doesn't count two-for-one --

6    Miss Grace Contee and Ms. Sarita Contee must, twice a day, go

7    through and search the defendant's room and make sure that

8    there is nothing in there.  You go though every drawer, every

9    nook and cranny of that room, and search him as well.  Make him

10   empty his pockets and person to make sure that he is no

11   electronic devices on him.  So that's every day, once a day.

12   Both of you must do that, including on the weekends Ms. Sarita

13   Contee must do that.  And you don't tell him when it's going to

14   be.  It's not a planned time.

15           And I understand there may be opportunities where PSA

16   is checking in or I may check in with you, I may call and ask

17   to set up a hearing.  And I'm going to ask you to say, under

18   oath, that every day you have done this.  And I've told you the

19   consequences of failing to be honest with me.

20           You must monitor the defendant's activity, Mr.

21   Glover, you must monitor him all day while he is in there.

22   Continue to go check on him in that room.  If there are any

23   violations, you must report it to pretrial services, to the

24   Court, and to local law enforcement authorities.

25           MS. SARITA CONTEE:  Yea, I do.

1           THE COURT:  Okay.  You are not to buy any new

2    electronic devices of any kind without first notifying PSA.

3    If -- the pretrial services agency.  If it is one that can be

4    used to access the internet, you need to notify them and get

5    permission from pretrial services.  They will then, in all

6    likelihood, notify me and then we'll hold another hearing.

7           This is going to eat up your time.  I want you to

8    understand this.  This is not a part-time job that you're going

9    to have.  You both are going to have a full-time job and it's

10   going to interfere with your life.  When you want to buy

11   something, when you want to do something, all of these things

12   are going to cause inconvenience.  And that inconvenience can't

13   be the answer to which is that you're just not going to worry

14   about it.  Because, again, I will step you back.  I don't care

15   how old you are, Ms. Grace Contee, I don't care how young you

16   are, it doesn't matter, how it could affect your health.  If

17   you can't be trusted to do this, I have to step you back

18   because in the next case Ms. Russo is going to say, hey, we

19   can't trust third-party custodian, the last third-party

20   custodians didn't do right by you, Judge.  So if I don't detain

21   you, I am then harming every other person who comes before me.

22          But remember, when you do right by me, every person

23   who comes before me, Mr. German is going to say, don't you

24   remember what Ms. Grace Contee did?  Don't you remember what

25   Ms. Sarita Contee did?  They followed the law, they followed

1   your direction, Judge.  You can trust a third-party custodian.

2          You are to remove the bedroom door to the room that

3   Mr. Glover is sleeping in.  He's not to sleep in another room.

4   You are to keep him in that room that's also close by to you,

5   Ms. Grace Contee.

6          MS. GRACE CONTEE:  Yes.

7          THE COURT:  At any point if you do not believe that

8   you're able to be there on this 40-hour a week schedule, you

9   are to notify the Court in advance and pretrial services within

10  24 hours.  So if something changes in your job, you get a

11  different job or something like that, you can't be there,

12  Ms. Sarita Contee, 24 hours in advance you must notify me and

13  we will hold an emergency hearing.

14         You have to understand, no minors are allowed into

15  the residence.  You are to enforce that condition.  You are not

16  to allow Mr. Glover to have any -- if you have a phone call and

17  you're talking to somebody, you're not allowed to let him use

18  the phone.  He's not allowed to contact anybody using that

19  phone.  I don't care who it is, he is not allowed to use your

20  phone to contact people.  He is in jail.  You got to

21  understand, he's in jail, it's just in your house.

22         He's not to have contact with any third-party of any

23  person.  I don't want him talking -- if someone is coming into

24  your house, I want you to understand, he has to go stay in the

25  bedroom.  He's not down there to meet or socialize with them.

```
 1    He stays in his room.  He's not talking to anybody.  So there's

 2    no opportunity to -- let's say someone puts -- they smuggled in

 3    a phone and somehow you didn't see it, they're not going to go

 4    meet with him.  He's in his room at all times when someone else

 5    is coming into the house.  Now, when there's not someone else

 6    in the house, there's just the three of you, he's allowed to be

 7    in the house and travel where he wants to.  But he's not to

 8    have contact with any person in any situation in the house.  I

 9    don't want him talking on the phone to any other person while

10    he's there.  Do you understand that, Ms. Grace and Ms. Sarita?

11    Do you understand that?

12              MS. SARITA CONTEE:  Yes, sir.

13              MS. GRACE CONTEE:  Yes.

14              THE COURT:  One moment.

15              (Pause.)

16              THE COURT:  Mr. Copes, I understand that pretrial has

17    requested his continued detention, but I want to understand,

18    given these conditions, are there any other conditions of

19    release that you think that I ought to impose or that are

20    needed that can go to my concern to mitigate, prevent

21    Mr. Glover from having access to the internet at any time?

22              PRETRIAL SERVICES:  John Copes, pretrial services.

23    That the defendant not possess a firearm, destructive device or

24    other weapon, and report as directed to pretrial services.

25              THE COURT:  Okay.  Anything else?  Any other
```

1      conditions of release, Mr. Copes?

2            PRETRIAL SERVICES:  No, Your Honor.  Thank you.

3            THE COURT:  Okay.  Ms. Russo, first, before I give

4      you the opportunity to appeal, I want to know that,

5      understanding if you do, or if these are conditions --

6      conditions are maintained, is there anything else that you

7      would seek to be added to amplify these conditions to, again,

8      assure the -- reasonably assure the safety of the community?

9            MS. RUSSO:  So, I think you probably said this, Your

10     Honor, but he needs to be on a GPS tether because of the Adam

11     Walsh Act.  The government would also -- the reason I need to

12     check the address is I just -- I need to verify that it is not

13     within 100 yards of any school or day care center.  So I do

14     need that from pretrial, and then the dates of birth.  I am

15     going to ask for a 24- or 48-hour stay, Your Honor, for an

16     appeal.  But I don't have any other conditions, other than

17     those the Court has imposed.

18           THE COURT:  Okay.  Thank you.  So, I want to be very

19     clear, Mr. Glover.  First, I'm going to come to you.  The

20     government is going to, in fact, appeal my decision, I'm going

21     to grant a 48-hour stay.  So what that means is this will be

22     back before the Chief Judge, Chief Judge Howell, who she will

23     then, as a District Judge, she'll have a completely new

24     hearing.  All these questions and things we've talked about,

25     it's going to happen all over again.  However, I want to

1    understand -- make sure you understand, I am ordering your

2    release, but that is not happening.  However, I want to make

3    sure you understood all the conditions.

4            Did you understand -- I'm sorry that we have not

5    heard from you, largely we've been talking to the third-party

6    custodians.  But as you can hear, I did, in fact, order your

7    release.  Do you understand those conditions, Mr. Glover?

8            THE DEFENDANT:  Yes, sir.  Yes, Your Honor.

9            THE COURT:  And if you are released -- understanding

10   that the government, within the 48 hours, they may change their

11   mind, or Judge Howell simply imposes my conditions -- do you

12   understand what those conditions of release mean, that you have

13   to follow them?  Do you understand that?

14           THE DEFENDANT:  Yes, Your Honor.

15           THE COURT:  And you would follow those conditions of

16   release, Mr. Glover?

17           THE DEFENDANT:  Yes, Your Honor.

18           THE COURT:  Miss Grace Contee, Ms. Sarita Contee, so

19   I want you to, again, understand what's happened here.

20   Although I have ordered Mr. Glover to be released to your

21   third-party custody with those conditions of release that I

22   described, the government is going to seek a stay.  That means

23   they're going to pause my decision while they go to a higher

24   authority above me, the Chief Judge, and we're going to have

25   this whole hearing again, then.  You're going to have to be

1    available.  The chief judge will likely want to hear from you,

2    inquire upon you as to what those conditions of release that we

3    have agreed to, they'll want to hear about, you know, your

4    health.  They'll want to hear about how often you can be

5    available.  All the things I talked about today, that and more.

6         And ultimately it will be the Chief Judge's decision.

7    She's not going to say, well, Judge Faruqui said one way, so

8    I'm going to defer to him.  She's going to make her own

9    decision.  It's a completely new hearing.  And then, again, you

10   have the opportunity, as does Mr. German -- I'm sorry, the

11   government has opportunity, as does Mr. German, no matter what

12   decision is made there, they can appeal it to other higher

13   court.  Okay?

14        So nothing is going to change right now.  You're not

15   going to be made a third-party custodian at this time because

16   we have to have another hearing with a new judge pending that

17   appeal.  Do you understand that?

18             MS. GRACE CONTEE:  Yes.

19             THE DEFENDANT:  Yes.

20             THE COURT:  So I'm going to -- Miss Russo, I think,

21   technically, you have made it, but I'm just going to tell you

22   what my practice has been in the past and then hear from you,

23   if you have any concerns about that.  I will issue a minute

24   order today indicating that I do believe that home

25   incarceration, with the conditions that we have indicated, we

1    will hopefully, within -- by the end of today issue that minute

2    order and include in it the conditions of release.  I am going

3    to -- as I understand, you're requesting a 48-hour stay, is

4    that right, Ms. Russo?

5               MS. RUSSO:  That's correct, Your Honor.

6               THE COURT:  Okay.  Thank you.  Yes, I'm going to go

7    ahead and orally grant the government's motion for a 48-hour

8    stay pending my -- pending my -- bringing that before the Chief

9    Judge, that appeal.  That, as I will note in my minute order,

10   the government's appeal will transfer this matter to the

11   purview of the Chief Judge, who will preside over that motion,

12   the defendant's motion for release, as well as the government's

13   emergency motion for stay.  And so any further request for

14   relief, including of the continuation of the stay, must be

15   taken before the Chief Judge.

16               Of course, if for any reason the Chief Judge is

17   unavailable or something that happens, Ms. Russo, or

18   Mr. German, you are welcome to come before me and I will then

19   do everything in my power to then ensure that there's not a

20   situation which something falls through the cracks.  That being

21   said, of course, I am concerned that Mr. Glover, as a presumed

22   innocent person, is being detained with an order of release.

23   And so I only issue my 48-hour stays because I think it's

24   important that it gets on the record quickly, the government's

25   appeal, and that it is quickly before -- presented to a judge.

1    When that judge holds that hearing, that's ultimately not

2    something that's at all my purview, and I leave it to that

3    other judge to determine that.  I will say, as we all know, for

4    the parties, that Chief Judge Howell is extremely diligent and

5    I'm sure will turn to this very quickly.

6              So, Ms. Russo, anything else from your end on this?

7              MS. RUSSO:  No, Your Honor.  I will connect with

8    pretrial about those two things that I had asked about, and I

9    don't have anything else.

10             THE COURT:  Okay.  As always Ms. Russo, I am

11   appreciative of your professionalism.  And, again, I did think

12   that you made some compelling arguments and things that --

13   these aren't difficult -- I'm sorry.  These aren't easy, they

14   are very difficult questions.  And I appreciate how you handle

15   yourself and the way that you come at this and are trying to do

16   what you (unintelligible) you believe, and I understand that

17   you believe to be necessary to reasonably ensure the safety of

18   the community.  So, thank you, Ms. Russo.

19             Mr. German, again, I also want to state, quite

20   clearly for the record, I appreciate how you have flagged these

21   issues and the time and attention you've put into them.  I

22   think every person deserves to ensure that they -- you know, as

23   a presumed innocent person, has full representation, and to

24   ensure that they -- that they in fact are treated with dignity

25   and respect in court, and that they are treated with -- their

1   detention determinations decisions are made thoughtfully.  I

2   appreciate that you make sure always, Mr. German, that that

3   happens.  And I appreciate the lengths that you have gone

4   through for your client.  Even after an initial detention

5   determination, did not give up and doggedly pursued what you

6   believe to be right.  You are a credit, Mr. German, to our

7   profession of lawyering.

8           Is there anything else that you would like to add,

9   Mr. German, in terms of -- I understand that the stay is not

10  something you're hoping for, but I have already ordered it and

11  I think it is appropriate.  Anything else that you would like,

12  Mr. German, or anything else I need to consider?

13          MR. GERMAN:  No, Your Honor.  But just for the

14  record, I would note our objections.

15          THE COURT:  Thank you so much.  Mr. German has

16  objected to the stay, but I will overrule that.

17          Ms. Grace and Miss Sarita, I likely won't see you

18  again because you'll be before the judge.  You heard from

19  Ms. Russo, and I hope that you will take really to heart what

20  she has said.  A prosecutor does not need to say that, but she

21  did, and I do again, echo with her, and I know Mr. German feels

22  the same way.  We all admire you for what you've done here

23  today.  It is truly a profound thing that you did, to be

24  willing to step up to the plate, inconvenience your lives

25  greatly.  No matter what happens, I'm sure Mr. Glover is

1    incredibly appreciative, but I am appreciative because I'm a

2    member of this community, as are the people on this call.  The

3    prosecutor and defense lawyer and I understand that you took

4    this very seriously, the desire to do something and put

5    yourself out and to try to keep everyone safe, but also do

6    right by Mr. Glover.

7           So thank you for what you're doing.  I promise you, I

8    will not forget what you did today.  It's something that will

9    stick with me as I think about these things in future hearings.

10   And I hope and wish the best of you luck to you in the future.

11   So take your of yourselves, and please stay in touch with

12   Mr. German.  He'll let you know when you need to be present for

13   the next hearing.  Okay.

14           MS. SARITA CONTEE:  Okay.  Thank you.

15           MS. GRACE CONTEE:  Thank you.

16           MS. SARITA CONTEE:  Have a nice day.

17           MS. GRACE CONTEE:  And be blessed.

18           THE COURT:  Okay.  Same to you all.  Parties are

19   excused.  Take care.

20           MR. GERMAN:  Your Honor, if it's possible could I

21   have a could few minutes with Mr. Glover?

22           THE COURT:  Yes.  Sure.  Mr. Tran, could you put Mr.

23   Glover into breakout room with Mr. German for ten minutes, Mr.

24   Tran?

25           THE COURTROOM DEPUTY:  Yes.
                        *   *   *

```
1                        CERTIFICATE

2        I do hereby certify that the foregoing is a true, correct

3    and complete transcript of the audio-recorded proceedings in

4    this matter, audio recorded on November 15, 2021, and

5    transcribed from the audio recording to the best of my ability,

6    and that said transcript has been compared with the audio

7    recording.

8                              Dated:  December 8, 2021

9

10                           /s/_____

11                           Janice Dickman
                             Official Court Reporter
12                           333 Constitution Avenue
                             Washington, DC  20001
13                           202-354-3267

14

15   This hearing was held telephonically in compliance with the
     COVID-19 pandemic stay-at-home orders and is, therefore,
16   subject to the limitations associated with the use of current
     technology, including but not limited to telephone signal
17   interference, static, signal interruptions, and other
     restrictions and limitations associated with remote audio
18   videoconferencing.

19

20

21

22

23

24

25
```