UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,        )  Criminal Action
                                 )  No. 21-609
vs.                              )
                                 )
RAYMOND GLOVER,                  )  November 23, 2021
                                 )  1:32 p.m.
              Defendant.         )  Washington, D.C.
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**

*(Parties appearing via videoconference and/or telephonically.)*

<u>**APPEARANCES**</u>:

FOR THE UNITED STATES: APRIL RUSSO
                       U.S. Attorney's Office
                       Appellate Division
                       555 Fourth Street, NW
                       Washington, DC 20001
                       (202) 252-1717
                       Email: april.russo@usdoj.gov

FOR THE DEFENDANT:  JOSE GERMAN
                    Federal Public Defender
                    For the District of Columbia
                    625 Indiana Avenue, NW
                    Washington, DC 20004
                    (202) 208-7500
                    Email: jose_german@fd.org

ALSO PRESENT:       CHRISTINE SCHUCK, Pretrial Services

Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                    Official Court Reporter

*This hearing was held via videoconference and/or*
*telephonically and is, therefore, subject to the limitations*
*associated with the use of technology, static interference, etc.*

Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

1                           **P R O C E E D I N G S**

2                  THE COURTROOM DEPUTY:  Matter before the Court,

3      Magistrate Case No. 21-609, United States of America versus

4      Raymond Glover.

5                  Your Honor, for the record, Pretrial Agent

6      Christine Schuck is joining us via telephone.

7                  Counsel, please state your names for the record,

8      starting with the government.

9                  MS. RUSSO:  Good morning, Your Honor.

10     April Russo on behalf of the United States.

11                 THE COURT:  Yes.  Good afternoon, Ms. Russo.

12                 MR. GERMAN:  Good afternoon, Your Honor.

13     Jose German on behalf of Mr. Glover.

14                 THE COURT:  Yes.  Good afternoon, Mr. German.

15                 Good afternoon, Mr. Glover.

16                 THE DEFENDANT:  Good afternoon, Your Honor.

17                 THE COURT:  Do you have any difficulty hearing or

18     seeing us?

19                 I forgot my mask.

20                 THE DEFENDANT:  No, Your Honor.

21                 THE COURT:  Let me just put this on; I totally

22     forgot my mask.

23                 Excuse me just one second.

24                 You-all are lucky you don't have to have a mask on

25     right now.

1      All right.  Mr. Glover, do you agree, after

2   consultation with counsel, to participate in this hearing

3   remotely, rather than being physically present in the

4   courtroom this afternoon?

5      THE DEFENDANT:  Yes, Your Honor.

6      THE COURT:  All right.  So let me just review why

7   we're here.  I mean, Mr. Glover was arrested -- Mr. Glover,

8   could you mute your machine?  My court reporter is getting a

9   lot of feedback.  Do you know how to do that?

10     THE DEFENDANT:  No.  Do you want me to call

11  someone?  Do you want me to ask --

12     THE COURT:  Yes.  They don't have the machine

13  there where you can do it?

14     THE DEFENDANT:  No.  I can ask them to come back.

15     THE COURT:  If you could do that because she's

16  having great difficulty hearing with the feedback.

17     THE DEFENDANT:  All right.

18     (Whereupon, the proceeding pauses.)

19     THE COURT:  Okay.  So, Mr. Glover --

20     THE DEFENDANT:  Yes.

21     THE COURT:  -- you know -- you are in Lewisburg

22  now; is that correct?

23     THE DEFENDANT:  Yes.

24     THE COURT:  I have had other videoconferences with

25  people in Lewisburg and they have been able to somehow mute

1    it; but you don't have the machine there where you can do

2    that?

3              THE DEFENDANT:  I don't.

4              I don't know how.  I've never used one of these.

5    It's a monitor, so --

6              THE COURT:  There is no control apparatus at all?

7              THE DEFENDANT:  (Unintelligible).

8              THE COURT:  I see.

9              THE DEFENDANT:  I see a mute -- I see a mute

10   button; I am pressing it, but -- can you hear me?

11             THE COURT:  Okay.  We can still hear you.

12             Okay.  So we're going to try and proceed; my

13   courtroom deputy has sent an email to them.

14             So let me just review -- Mr. Glover, just relax --

15   oh, you muted it; excellent.  We can't hear you.  Perfect.

16   Okay.  Excellent.

17             Okay.  So we're here because the government has

18   asked for review of the pretrial release order granted by

19   Magistrate Judge Faruqui on November 15th releasing

20   Mr. Glover to two relatives subject to a whole series of

21   conditions.

22             So, Mr. Glover, just so you understand why you are

23   in front of me, your case has not been formally assigned to

24   me.  But, as the Chief Judge of this Court, I hear motions

25   for review of magistrate judge orders; and that's why you

1     are in front of me today; and the government has asked for a

2     review of the magistrate judge's release order.

3              So, in connection with this hearing, I have

4     reviewed the government's motion for an emergency stay and

5     review of the magistrate judge's release order, and the

6     reply filed by the government, docketed at ECF 19; the reply

7     was docketed at ECF 22.

8              I have also reviewed Mr. German's opposition,

9     docketed at ECF 21; the magistrate judge's release order,

10    docketed at ECF 18.  And I have reviewed the underlying

11    briefing, including the defendant's motion to reconsider

12    release from custody, docketed at ECF 12; and the

13    government's opposition to that.

14             So let me just turn first to Ms. Russo, since it

15    is the government's motion for review.  And I just want to

16    focus initially on the facts of the case since -- I

17    understand that, when the search warrant was executed at

18    Mr. Glover's house or apartment, he was found to actually be

19    watching a screen with either -- and on the screen was

20    either a video or images of an adult sexually abusing an

21    infant; is that right?

22             MS. RUSSO:  Yes, Your Honor.

23             Mr. Glover claimed that he was not sitting at the

24    desk watching that; but when the FBI hit the door, they

25    observed that.  He said he was on the phone, so he wasn't

1    really paying attention to what was on the screen, I

2    believe.  But on the screen there was an infant being raped;

3    and this was in a chat room where other adult males were

4    masturbating to that same video of the infant being raped,

5    so -- a chat room where all of the individuals were in the

6    room and somebody shared this video with the other

7    individuals, just like on Zoom.  This wasn't in Zoom, but it

8    would be the same as if, right now, somebody hit share on

9    their computer and shared that; and then you can see the

10   small videos of the other people in the room watching, and

11   some of them were adult males and were masturbating to this

12   video.

13            THE COURT:  All right.  So this was a recording,

14   not some real-time live stream of the infant being raped; is

15   that right?

16            MS. RUSSO:  I don't think we know because it could

17   have been an individual sharing what was happening in the

18   room where they were or it could have been someone sharing

19   the video.  I think we assume it was somebody sharing the

20   video, but I don't think we know for sure.

21            THE COURT:  I see, because it wasn't made

22   absolutely clear in the complaint, which I also reviewed.

23            All right.  And my understanding is that, when the

24   agents knocked on the door to execute the warrant,

25   Mr. Glover said that he had to put some clothes on because

1    he was naked; is that right?

2              MS. RUSSO:  I am not sure.

3              THE COURT:  Okay.  That's not true?  That may be

4    from another case, so -- okay.  I just wanted to -- because

5    wasn't it -- was it early in the morning that this happened?

6              MS. RUSSO:  It was.  It was, like, 6 a.m.

7              THE COURT:  Oh, yes.  No.  It was this case

8    because it was in the complaint.  He answered the door; but,

9    prior to opening it, stated he didn't have any clothing on

10   and wanted to get dressed.  All right.  So you were

11   confusing me, Ms. Russo.

12             MS. RUSSO:  I'm sorry.  I didn't remember exactly,

13   and I didn't want to misstate anything.

14             THE COURT:  Okay.  So the government has indicated

15   that 13 electronic devices were taken from Mr. Glover's

16   residence, and what's been identified as the laptop computer

17   and an iPhone.  So what are the other devices that make up

18   the 13 devices?

19             MS. RUSSO:  I don't know all of them, Your Honor,

20   because they're still being forensically examined.  I know

21   they spent the most time on the laptop and the iPhone, and

22   they found over 100 images of videos of child pornography on

23   the iPhone.  And I checked with the agent today; and on the

24   laptop they found over 30 so far.  They're still analyzing

25   the laptop.

1              THE COURT:  Okay.  And just so the record is

2      absolutely clear, these are a hundred videos on the iPhone,

3      and 30 videos on the laptop of child pornography?

4              MS. RUSSO:  That's correct, Your Honor.

5              And, actually, the iPhone they have already

6      submitted to the National Center For Exploited and Missing

7      Children; and I know there were identified victims that the

8      National Center For Exploited and Missing Children had

9      previously identified that will be entitled to restitution

10     in the case.

11             THE COURT:  Okay.  All right.  And so the

12     government has also proffered that the defendant saved child

13     pornography in multiple different platforms.  So does that

14     mean in platforms other than what's being referred to as

15     "Application A"?

16             MS. RUSSO:  That's correct, Your Honor.

17             And I can say this, I believe "Application A" is

18     Telegram; but there were multiple other areas in which the

19     defendant saved child pornography to include his Google

20     drive account.  We believe MEGA and, possibly, Dropbox as

21     well.

22             THE COURT:  Okay.  But those are things that

23     are -- those are platforms that are still being searched?

24             MS. RUSSO:  Correct.  I think we are looking

25     through the devices to continue to corroborate which

1     platforms he was using.  But we know for sure -- for certain

2     that he was in three to four different groups on Telegram,

3     and that somebody had commented:  Congratulations on being

4     an administrator, in one of those groups; and that he had

5     told somebody in one of those groups that he was a "true

6     dad."  And then we know also for sure that he was using

7     Google to store child pornography as well.

8                THE COURT:  What am I supposed to make of the

9     statement that he's a "true dad"?  I don't know what that

10    means.  What am I supposed to make of that?

11               MS. RUSSO:  I think the concern that we had, Your

12    Honor, is he's talking to other pedophiles.  He's talking to

13    people he knows that are sexually exploiting children or

14    interested in sexually exploiting children.  He, in fact, is

15    a father.  And in order to, sort of, gain acceptance from

16    them and fit in with their group, shares with them that he

17    is a true father; and certainly that gave us a little bit of

18    alarm.

19               We don't have any evidence that he abused his

20    children at this point, Your Honor; I am not alleging that.

21    But certainly telling other people you know to be sexually

22    interested in children that you are, in fact, a father is an

23    alarming thing.  We see this in other cover chats all the

24    time, where that begins a conversation about fathers

25    actually exploiting or abusing their own children; and it,

1    sort of, starts with that kind of admission that they have

2    children.

3                 THE COURT:  And how old are his children?

4                 MS. RUSSO:  I believe -- I don't know for sure,

5    Your Honor.  They don't live with him.  And I believe that

6    they are either teenagers or adults at this point.

7                 THE COURT:  Okay.  And the two third-party

8    custodians who were found adequate by the magistrate judge

9    are relatives of the defendant; is that correct?

10                MS. RUSSO:  That's my understanding, Your Honor.

11                THE COURT:  And the government provides some

12   information about the person named "Grace" with whom the

13   defendant proposes living.  And the government describes her

14   as in remission from an illness and says that she was not

15   very mobile; she was elderly.  She didn't know what

16   encryption or VPN was, was not familiar with Telegram.

17                And so my understanding is she doesn't have a

18   computer at home and she doesn't have an internet connection

19   at home; is that right?

20                MS. RUSSO:  That's correct, Your Honor.

21                She stated that she -- and she was sworn under

22   oath that she did not have any internet activity in her home

23   or accessibility; that she didn't have any electronic

24   devices other than her cell phone.

25                THE COURT:  And so -- and she's elderly; so

1     presumably she's not working, is that right?

2              MS. RUSSO:  That's correct.  My understanding is

3     she's home all day, except for when she needs to get

4     groceries or go to a doctor's appointment.

5              THE COURT:  So, in some ways, she's, sort of, a

6     rare find -- right? -- no computer, no internet access?  So

7     why isn't she the perfect third-party custodian here?

8              MS. RUSSO:  Yes, Your Honor.

9              In some ways, I do agree that she is a rare fine.

10    But in other ways, the reason that she is home and the

11    reason that she is not out and about and doesn't have a job

12    is because of her age; and I don't know exactly how old she

13    is.  I think that she said -- I think I asked that question;

14    and I am not sure that the answer was the actual answer,

15    Your Honor.

16             She said she was, I think, in her 60s.  I could be

17    wrong, Your Honor, but it just seemed to me that she might

18    be older than that; I can certainly be wrong.  But she is in

19    remission for an illness she said; and she said that she is

20    not very mobile, and that she mostly stays in her room.

21             She has, I think, a three-bedroom house I believe;

22    and, obviously, Mr. Glover would be staying in a separate

23    bedroom.  I believe there are multiple floors to the house.

24             And the government's concern is that, as I

25    mentioned, the reason that she is able to be at home and

1     that she isn't out and about more, I think, is because she

2     is struggling with physical ailments, Your Honor.

3             And I think it would be very difficult for someone

4     in that position to adequately supervise someone like

5     Mr. Glover who used very sophisticated techniques

6     specifically to obfuscate law enforcement efforts.  I think

7     in the Telegram chats they talk about how they're avoiding

8     police.  And the reason we found Mr. Glover is because of

9     another individual who was in Telegram that allowed us to

10    see the chat, which we could never access otherwise; that

11    then allowed us to get a search warrant that led to the

12    discovery of Mr. Glover.  We never would otherwise have

13    found him had we not had this other offender.

14            So I just think when someone is using

15    sophisticated techniques, as Mr. Glover, and those encrypted

16    chats, somebody like Ms. Grace -- who seemed perfectly

17    wonderful -- I think would have a difficult time supervising

18    him.  In addition to that, Your Honor, she said she had

19    known him all of his life; that she had known him extremely

20    well; that he checked on her for -- every single week, Your

21    Honor.  But, of course, she was not aware of the child

22    pornography activity, which is not surprising; but it is

23    part and parcel of why it's difficult for a third-party

24    custodian to supervise someone like Mr. Glover because

25    individuals who engage in this activity have made a

1    lifestyle habit of hiding what they do from everyone around

2    them.  They live two separate lives, and they know how to

3    lie.  They know how to hide things because they have had to

4    do that for years; and that's what he was doing specifically

5    with this third-party custodian.  Even though she knew him

6    very well, she had no idea that he was engaged in any of

7    this activity.

8                    THE COURT:  Okay.  All right.  So the government

9    has stressed that pretrial services in the District of

10   Columbia -- I guess they don't make home visits, let alone

11   unannounced home visits.  And you have raised that as a

12   concern about how well the third-party custodians in this

13   case would be able to do their job and ensure Mr. Glover is

14   not able to obtain access to the internet and engage in

15   further illegal possession or distribution or receipt of

16   child pornography.

17                   And how has that particular concern about pretrial

18   services not being able or being authorized for different

19   rules, being able to do home visits, been handled in the

20   other five child pornography-related cases that Mr. German

21   mentioned where the magistrate judges in this court have

22   released the defendants, without coming to my attention

23   because there was no request or motion from the government

24   for review of those decisions.  So this is actually the

25   first case where I am learning about that, those cases.

1      MS. RUSSO:  Yes, Your Honor.

2          So for, I think, two of the four, the government

3   did request detention.  So, first, I will start with Matthew

4   Sharp; that defendant is subject to unannounced home visits

5   because he's being supervised in Ohio.  So that defendant --

6   we did ask for detention; we lost that argument.  But I

7   think there was some comfort in the fact that he is subject

8   to those visits; although we still would view that detention

9   was the appropriate course of action in that case.

10         THE COURT:  You mentioned four cases.  Were there

11  four or were there five?  One, two, three -- you are right;

12  there are four of these cases.  This would be the fifth, I

13  guess.  Okay.

14         MS. RUSSO:  I mean, actually, the defense did

15  mention a fifth case, Your Honor.  I think Your Honor hadn't

16  asked me to file it; but I am happy to talk about it.  It

17  happens to be my case.  It's United States versus Joseph

18  Casten.  So I think I can explain what happened in that case

19  as well, if Your Honor would like me to.

20         But for Sharp, that's what occurred; he is being

21  supervised elsewhere.

22         For Peksa, that one we asked for detention; there

23  was already a district court assigned; and, actually, that's

24  true for Roberson, too.  Both of those cases were indicted;

25  they were not complainted (sic); and they were indicted

1    years after the criminal conduct occurred.  And so, for both

2    of those cases, the district court judge was already

3    assigned.

4           I think that the detention hearings -- at least

5    for Peksa was still in mag court; but they did not appeal

6    that decision to Judge Leon who would have been the

7    presiding judge.  And I did talk to the AUSA about why she

8    didn't appeal to Judge Leon.  She explained for her, like,

9    the year delay between when the interview occurred and the

10   criminal conduct occurred, and the date of the actual

11   indictment and arrest, but -- coupled with some of the facts

12   of the case that made it less egregious than this case; I

13   think those two things together she made the decision not to

14   appeal to Judge Leon.  But that defendant is not subject to

15   home visits either, Your Honor, to your point.

16          And then Roberson, as I mentioned, was a case

17   actually going all the way back to 2015 and 2016; the case

18   was indicted over a year after the defendant was identified.

19   And in that case the government did not ask for detention at

20   all; and the defendant was given pretrial release.  He had

21   no child pornography on any of his devices.  He had one

22   video that he distributed that was the subject of the

23   indictment.  And that, again, was 2015 or 2016 when that

24   video was distributed.

25          And then Johnston was the other case Your Honor

1    had mentioned.  And, again, the same thing, it was a

2    16-month delay between the search warrant execution and the

3    actual charges in that case; and in that case no child

4    pornography was discovered on any of the defendant's

5    devices.

6          Again, there wasn't this use of encrypted social

7    media; there wasn't the discussions with like-minded

8    individuals, like Mr. Glover engaged in; there wasn't this

9    activity on the date of the search warrant when they kicked

10   in the door, like we saw with Mr. Glover; and no particular

11   interest in toddler-aged children, which we have seen with

12   Mr. Glover.  So I think those cases are also very

13   distinguishable.

14         The fifth case that's mentioned, Casten, that case

15   was -- I believe the search warrant was executed in November

16   of 2017, Your Honor; I joined the office in May of 2020.

17   That case was assigned to me when I joined the office.  At

18   that point, the defendant had a defense attorney already; he

19   had been given a target letter.  And he was in therapy and

20   had been -- since 2017 not having any terms of supervision

21   over him.  So charging the case when we did, in the summer

22   of 2020, almost three years later, I did not feel

23   comfortable requesting detention in that case, particularly

24   when there was a defense attorney; he was in therapy.  And

25   for all of those reasons, Your Honor, I did not ask for

1      detention in that case.

2              There was also a peer-to-peer case.  Initially,

3      there was no child pornography found on the defendant's

4      devices.  We did do another forensic exam; and we did

5      discover a few hundred images and videos of child

6      pornography when I started at the office.  And that case did

7      not involve any conversations with like-minded individuals;

8      did not involve encryption; did not involve sophisticated

9      chats, like Telegram, or anything of that nature, Your

10     Honor; it was just a peer-to-peer program.  It was certainly

11     egregious, and certainly very serious; but it was only his

12     activity in that program that the government charged.

13             THE COURT:  All right.  Thank you.  That's very

14     helpful to me in figuring out what's going on in these other

15     cases.

16             So is it basically -- I mean, looking at the list

17     of the conditions that the magistrate judge imposed, it's

18     hard to think of anything else that can be done.  I mean,

19     they have gotten down to details including removing the door

20     to the defendant's bedroom in the third-party custodian's

21     residence.

22             So is it just basically the government's view that

23     given all of the circumstances surrounding Mr. Glover's

24     offense conduct that there simply are no conditions that can

25     assure -- ensure the safety of children in the community

1    from him seeking out a means to obtain, view, possess child

2    pornography?

3              MS. RUSSO:  I think that the defendant has two

4    extremely well-meaning third-party custodians; I think they

5    would do their very best, Your Honor.

6              But, I think, just looking at the content on his

7    devices, the kinds of videos and images he had, the fact

8    that he was doing this on the date of the warrant -- they

9    arrested him immediately.  I think that the compulsion that

10   he has -- looking at experience with other cases, I think

11   that he will find a way to engage in this activity again.

12   And I think the risks that he does so and the harm to even

13   one other potential child is too great.  And I think -- this

14   is a presumption case; and I think this is a case that falls

15   squarely within -- when we look at the factors, the kind of

16   offender that no conditions could assure the safety of the

17   community given -- and I know that's not -- the

18   third-party custodians, I am sure, would do their very best.

19   But I think the compulsion to engage in this kind of

20   activity is very strong; and I think given how prolific his

21   activity was, how many devices he was using -- I think it's

22   a concern; and the government doesn't feel like it's

23   addressed by the conditions.

24             THE COURT:  Okay.  All right.  Mr. German.

25             MR. GERMAN:  I apologize, Your Honor, I was having

1   a hard time unmuting.

2          THE COURT:  I can hear you now.

3          What exactly is the relationship between the

4   proposed third-party custodians and Mr. Glover?

5          MR. GERMAN:  Your Honor, Ms. Grace Contee is

6   Mr. Glover's aunt; Ms. Sarita Contee is his cousin, her

7   daughter.

8          THE COURT:  I see, cousin.  And the aunt's

9   residence is in Washington, D.C.?

10         MR. GERMAN:  That's correct, Your Honor.

11         THE COURT:  I see.  And is the aunt willing also

12  to provide, you know -- and pay for all of the room and

13  board for Mr. Glover?  Or how is he going to pay for living

14  expenses?

15         MR. GERMAN:  Yes.  Yes, Your Honor.

16         That was something that was addressed during the

17  hearing; what are we going to do about expenses.  And

18  Ms. Contee, I think, made clear that there was going to be

19  no issue with that; the family was going to get together and

20  make sure that Mr. Glover had all of the necessities he

21  needed addressed.

22         I can tell the Court that Mr. Glover has an

23  extremely, extremely supportive family.  One thing that I

24  didn't mention to the magistrate judge was that I am in

25  constant communication with multiple family members; they

1    are all extremely invested in his wellbeing; so I certainly

2    don't think that's going to be an issue here, Your Honor.

3           One thing I did want to address, though, was this

4    idea that -- the government, for whatever reason, seems to

5    speculate on Ms. Contee -- Ms. Grace Contee; they have made

6    her out to be, you know, a person that's bedridden, and not

7    mobile.  I can tell the Court that, after the hearing last

8    time before Judge Faruqui, I spoke with Ms. Contee; and she

9    actually made clear that she took offense to that.  She does

10   not see herself as that; she is indeed mobile.

11          She is just fine.  She is about 63 years old, I

12   believe.  So it's not as if she is 97 years old and can't

13   get out of bed, Your Honor; that's certainly not the case

14   here, and I want to make sure the Court understands that.

15          I am having --

16          THE COURT:  And so does she -- is the aunt

17   retired, so she doesn't work?

18          MR. GERMAN:  She is retired, yes, Your Honor.

19          THE COURT:  And so does the defendant -- does

20   Mr. Glover still hold on to all of his credit cards?

21          MR. GERMAN:  Your Honor, I do not believe -- I am

22   actually not sure, Your Honor.  But if that is an issue I am

23   happy that we could -- that's a condition that can be

24   addressed as well, Your Honor.  Mr. Glover obviously will

25   not be employed when he comes out, so I don't think that --

1    I don't think he's going to have a lot of access to money.

2         THE COURT:  All right.  And it was interesting

3    that there was a second custodian, the defendant's cousin,

4    who has agreed to stay at her mother's home Monday through

5    Friday, 8:30 to 4 p.m., to monitor Mr. Glover, and also to

6    visit at least one time each Saturday and Sunday, I guess;

7    so she's going to be spending a lot of time monitoring

8    Mr. Glover.

9         So it raised some concern in my mind that maybe

10   the aunt is so ill that she needed this help so many hours

11   on each day of the week that the cousin would have to be

12   there.  What is going on with that?

13        MR. GERMAN:  Your Honor, I can certainly tell the

14   Court that that is not the case.  The reason for that is

15   because Ms. Grace Contee lives alone; and she would have to,

16   at some point, leave the home, either for a doctor's

17   appointment, to get groceries or just to run everyday

18   errands.  And this is just one issue that we anticipated,

19   you know, in order to make sure that Mr. Glover is

20   supervised and monitored at all times, we wanted to make

21   sure we put a second person there just to avoid any issues

22   or have any gaps in times where Mr. Glover is at home by

23   himself and not supervised; so that's the reason for that,

24   Your Honor.  It's not at all because Ms. Contee needs some

25   help or anything like that.  Obviously she lives alone now

1    and is able to take care of herself, Your Honor.

2              THE COURT:  Well, it is perhaps not fair to D.C.

3    residents; but it is of some concern that these relatives

4    who are close to Mr. Glover are going to be themselves in

5    some way, sort of, unsupervised because there are no

6    unannounced and no home visits by pretrial services in this

7    district.

8              And even in those districts where pretrial --

9    federal pretrial services does unannounced home visits and

10   have actually found people on pretrial release with similar

11   charges violating the terms of their release, it does -- it

12   is a little bit of a -- more of a risk in this District,

13   wouldn't you agree, Mr. German, that pretrial services

14   doesn't make home visits?

15             MR. GERMAN:  I agree with that, Your Honor.

16             But I think that puts us in a situation where --

17   are we going to state that simply because there are no home

18   visits here that anyone charged with this offense does not

19   get released?  I certainly don't think that's what the law

20   is, and that obviously would be wholly inappropriate.

21             Just in regards to these cases, Your Honor, that

22   the government is pointing to -- at the last hearing the

23   government brought up the four cases from Michigan.  At the

24   time they mentioned that, well, there wasn't a big enough

25   sample for me to look at, and that's why we needed to pull

1    them from there.  Clearly there are people released here on

2    very strict conditions and are able to maintain compliance.

3            Your Honor, the government had some other cases

4    from other districts.  And if it's a numbers issue for the

5    government, Your Honor, we know that the overwhelming

6    majority of people who are released on pretrial do not

7    re-offend.

8            In fact, I was just looking at a 2019 report from

9    the courts, from probation and pretrial services, where -- I

10   think the number was 98 percent of people who are released

11   do not get rearrested; so we know for a fact that it's

12   extremely rare for someone to re-offend when on pretrial

13   release.

14           I am sure if the government went to each district

15   of -- for every case that the government cited, I would find

16   a number of cases where people have been released on similar

17   charges and that who have not had any issues with

18   compliance.

19           I think that in this case we have, Your Honor,

20   such an extreme number of restrictions; and I think one of

21   the most important ones is there is completely no access to

22   internet at this home.  I don't know exactly -- I think that

23   the ability to get a line is something that is severely

24   limited here.  So I think that really limits the risk, Your

25   Honor, even without home visits.

1          THE COURT:  Except that the aunt and the cousin

2     both have smartphones, right?

3          MR. GERMAN:  They do, Your Honor.  As Your Honor

4     has said, you know, it's rare to find someone without

5     internet; it's almost impossible to find someone without a

6     smartphone.  Apart from those conditions, those smartphones

7     will have at least six-digit passcodes; they would be on

8     persons at all times; obviously anybody who comes into the

9     home is going to have to register their phones with them.

10          So I think the issue here, Your Honor, for me is

11     that, again -- if we had to think about it in the

12     government's way, we would never release anyone charged with

13     these type of offenses; that's not what the Bail Reform Act

14     calls for.  I think, at the end of day, what we are supposed

15     to be looking at is what conditions can be fashioned to

16     reasonably assure the safety of the community.

17          And as I said in our motion, the Court here has

18     gone above and beyond to make those -- to put those

19     conditions in place; so I think he already has sufficient

20     conditions -- more than sufficient, honestly, to reasonably

21     assure the safety of the community.

22          And I think we can't -- we can't also put aside

23     that we have a 41-year-old person with absolutely no prior

24     criminal history for whom there is absolutely no reason to

25     believe that they are not going to follow the Court orders.

1    Again, this is someone with no record who has an extreme --

2    has community support here, who has held a job for over two

3    decades; someone that can clearly follow instructions.  I

4    don't think we can separate those two.  So I think when we

5    look at those two together -- those factors, Your Honor, and

6    with extremely restrictive conditions -- I think that more

7    than reasonably assures the safety of the community.

8              THE COURT:  All right.  I mean --

9              MS. RUSSO:  Your Honor.

10             THE COURT:  One of the reasons that the government

11   is seeking the detention here is because of the egregious

12   nature and circumstances of the offense conduct.  I mean,

13   infants being raped is pretty shocking, on video, on the

14   screen, when they're executing a search warrant -- that's

15   pretty egregious; and the evidence here is overwhelming,

16   overwhelming.

17             So in the face of that, and the other -- you know,

18   the other circumstances of the use of encryption, the

19   ability to lead a dual life -- of a stable worker at a

20   federal agency at the same time he is engaging over

21   fairly -- you know, over at least a year in this illegal

22   activity with a whole different set of virtual communities,

23   that -- all of those -- that level of both technical skill,

24   ability to be surreptitious -- does put this defendant in a

25   circumstance where -- you know, we always say, you know, you

1    can't ask for no risk when you release a person that they

2    might re-offend and they might even engage in the same

3    conduct; but when it comes to child pornography cases, you

4    almost have to have that standard of:  We cannot risk it

5    because of the vulnerabilities of the people involved.  I

6    think that's why Congress said there had to be a rebuttable

7    presumption.

8         So it's -- you know, it's sort of interesting

9    because one of these interesting conditions that the

10   magistrate judge imposed -- I guess based on some other

11   cases where the defendants have been released in the child

12   pornography cases -- is to take the door off his bedroom.

13   But aren't there going to be other closed-door rooms in that

14   house?  So, I mean, it's sort of -- isn't it just a Band-Aid?

15        I don't even understand that condition.

16        Mr. German, like, if there is a concern that he's

17   going to be alone in the room and do something that's risky

18   behavior, so much so that the room is -- the door is being

19   taken off his bedroom, how is that really going to make a

20   difference given the other doors to the bathrooms or other

21   bedrooms in the house?

22        MR. GERMAN:  Your Honor, I will say this, I

23   understand that the Government's position here is that the

24   allegations are serious; I think that's the one thing that

25   we can't (sic) take away from that.  Frankly, there is not

1    much disagreement on that.  I think it remains to be about

2    some aspects of the argument which are extremely

3    speculative; but no one really disagrees that the nature of

4    the allegations are serious.

5          I think that the one thing that is consistent is

6    what is absent from this argument, it's the presumption of

7    innocence; that's what the magistrate judge was explaining.

8    Those words have to mean something; it can't just be words

9    that we say -- we say out loud to make us feel better; they

10   have to actually mean something, especially in cases like

11   this.

12         The government hasn't turned over one piece of

13   discovery in this case that -- and while it may be for other

14   reasons I am not complaining about, it hasn't been -- these

15   allegations have not been challenged in any way, shape, or

16   form.  So I think that is something that we need to consider

17   here because the problem is -- the problem is --

18         THE COURT:  But, Mr. German, has the government

19   offered an opportunity for you to look at some of the videos

20   that have been recovered?  Or -- I will hear from the

21   government about why no discovery has been turned over yet.

22   Like, you haven't even gotten the search warrant receipt yet

23   to know what the 13 electronic devices are?

24         MR. GERMAN:  To my knowledge, we haven't received

25   anything.  But I think my -- to be clear, I am not even

1    complaining about that necessarily.  There are other aspects

2    of this case -- there are other things going on in this case

3    that probably are tied to that.  But I think this is just --

4    my point is this is the reality; we have not been able to

5    challenge this in any way.  But, again, I think the

6    problem --

7              THE COURT:  But yet -- yet, Mr. German, haven't

8    you consented to continuance of the preliminary hearing?

9              MR. GERMAN:  We have, Your Honor.  And that's my

10   point.  I think there are other things going on behind the

11   scenes that probably go to the reason why the government has

12   not turned over discovery in this case.  Yes.  We have

13   consented to the continuance of the preliminary hearing.

14             But, again, as I was saying, Your Honor, the issue

15   for me is that -- you know, presumably every case that comes

16   through this court is a serious one; after all, we are in

17   federal court where we are supposed to be charging only the

18   most serious of offenses.  So if that was our cause of

19   concern, then we really wouldn't be releasing anyone; but

20   that is just not the standard.  No matter what the case is,

21   that's not what the Bail Reform Act says.

22             THE COURT:  No, no, no.

23             Mr. German, you know, this is not about the

24   seriousness of the charges; it is about the nature of the

25   charges; the use of technical skills; the use of -- and the

1    use of those skills to hide activity even from close

2    relatives who are willing to step forward for him who had no

3    knowledge that he had this other double life, you know --

4    allegedly.  But it's -- you know, there is a difference

5    between people who harm -- you know, criminal conduct that

6    has child victims and child victims who are infants,

7    toddlers -- are so serious, with the risk of re-violation

8    with those kinds of victims -- something that Congress so

9    wanted to minimize that they made these crimes subject to

10   the rebuttable presumption for detention.  So this is not

11   just about serious crimes, this is about the particular

12   nature of this crime and charged conduct.

13             MR. GERMAN:  Understood, Your Honor.  I mean -- I

14   think I was probably using those interchangeably.

15             What I will say, Your Honor, with respect to the

16   sophistication aspect of this, it is -- at least in my

17   experience, it is rare for me to have one of these cases

18   where the government is not alleging that there's been some

19   level of sophistication here; and we see it at least in one

20   of those cases cited by the magistrate judge.

21             We see it in at least one of those cases where we

22   were talking about the levels of sophistication.  And,

23   actually, when we're talking about -- the government

24   raises -- as some of the distinguishing factors that they're

25   raising in this case and in other cases, they talk about the

1    time between the arrest and the alleged conduct, Your Honor.

2    And that's interesting because I am sure at least in some of

3    those cases the government was also there saying the reason

4    they couldn't arrest the person right away was because there

5    was a level of sophistication.  I would ask the Court to

6    approach that argument with caution as it is something

7    that's raised in almost every case, Your Honor.  In almost

8    every case I've seen there is some level of sophistication,

9    no matter what has actually happened.

10                   And, I guess, Your Honor --

11                   THE COURT:  And actually, I have seen, Mr. German,

12   a number of these cases where it doesn't involve that much

13   sophistication.  This is -- this is a more significant level

14   of sophisticated use of applications; you know, the ability

15   to sort of -- you know, to use the different components of

16   Telegram; to engage in group chats, messaging; transfer of

17   files, saving files, that is -- it's something that is not

18   uncommon; but it is -- it is distinguishing in this case.

19   So I don't fault the government for pointing that out in

20   this case compared to some of the other cases, I mean, that

21   I have seen involving child pornography or the mere transfer

22   of one video, for example, in one of the cases that has been

23   cited.  This is on a different level with access to multiple

24   different platforms and applications for the storage of

25   contraband.  Child pornography is contraband.

1          All right.  Ms. Russo.

2          MS. RUSSO:  Yes, Your Honor.

3          A couple of things that have come to my attention.

4          Pretrial services, I think, could speak to this;

5    but they did a search of that house, and there is internet

6    connectivity right now at that house through RCN.  That

7    house is also located near to schools and churches, so I

8    just wanted to raise that because I just learned that

9    information.

10          With respect to --

11          THE COURT:  Where did you learn that information?

12          MS. RUSSO:  From pretrial services, Your Honor; so

13    they could speak to it.

14          THE COURT:  Okay.  I was going to talk to

15    Ms. Schuck in any event.

16          MS. RUSSO:  Thank you, Your Honor.

17          With respect to some of the things that Mr. German

18    said; I want to first say that he mentioned that there are

19    very, very few violations on pretrial release, generally

20    speaking, for defendants in the federal system; and I think

21    that's true, Your Honor.  However, that's not true in the

22    child exploitation/human trafficking context; and that is

23    why I think that -- there is a presumption in these kinds of

24    cases, it's because there are so -- often violations when on

25    pretrial release.

1          One of the government's biggest concerns here in

2     this District -- and we would have a concern about release

3     no matter what, Your Honor -- is that it's very difficult

4     for the government to ever learn about violations when there

5     are no home visits and no vehicle searches and no

6     unannounced visits.

7          And I think one of the things that Judge Faruqui

8     was trying to accomplish by imposing the terms and

9     conditions that he did on the third-party custodians to do

10    searches, crack the door open -- is he was essentially

11    trying to make them like pretrial services officers, Your

12    Honor.  And the problem with that is that they are not

13    neutral parties here; nor do they have the training that

14    pretrial has or the background that pretrial has to do that.

15    And I understand why he wanted to do that, Your Honor; but I

16    think that it's problematic for the reasons that I just

17    stated.

18          In addition, Your Honor, Mr. German mentioned we

19    can't just have every single distribution of child

20    pornography defendant be detained because of the nature and

21    circumstances of this offense; and I agree with that, Your

22    Honor.  But I think because there is a presumption, what you

23    should see the government doing is asking for detention in

24    the majority of these cases because what Congress said is

25    that, in the majority of these cases, detention is

1    appropriate -- right? -- and there are going to be some

2    exceptions for that.  And I hope that, in each case, the

3    government attorney analyzes the facts of that case and

4    looks at all of the factors and makes a determination that

5    is consistent with the Bail Reform Act, and consistent with

6    justice, and consistent with Congress's direction.

7            And I think that's what we have done in this case,

8    Your Honor.  This is a case that falls in the more egregious

9    of the distribution of child pornography cases in this

10   District.  We don't often see a defendant on Telegram; it's

11   becoming more common, unfortunately, that there's

12   individuals using encryption like this.  But it's rare that

13   I find a chat in which the defendant is a participant in

14   where there is a discussion about avoiding police --

15   right? -- which is what we found in this case.

16           And in terms of the handful of cases that I put

17   into my reply last night, Your Honor, those -- when I say

18   that there are a handful of cases, a handful of examples, I

19   mean it.

20           I have actually surveyed the country on this

21   issue, and I have a chart of numerous, numerous cases from

22   numerous, numerous AUSAs from all over, who have discussed

23   pretrial violations of child exploitation defendants who

24   were charged with or seeking distribution and possession of

25   child pornography, and I selected a few to put in that

1    motion; so these are not the only examples.

2         So, for all of those reasons, Your Honor, the

3    government maintains that, when we look at the factors here,

4    the nature and circumstances of the offense -- we look at

5    the prolific activity on Mr. Glover's part, the different

6    ways in which he was collecting this, the different devices

7    which he was transferring it to; look at the fact that he

8    was viewing it on the date of the search warrant; the only

9    reason it stopped is because the FBI thought that there were

10   other -- additional children would have been victimized by

11   Mr. Glover; I think that weighs in favor of detention.

12        If we look at the potential danger to any one

13   person in the community, I think there is a danger to

14   children; and that's been exhibited by Mr. Glover's

15   activity -- by the length of the activity; by the different

16   ways in which he's collected this material; by the types of

17   images and different videos he's collected; by the way he's

18   doing it in an encrypted format -- all of those things

19   indicate that there is a danger.

20        And the weight of the evidence, Your Honor, we

21   have the defendant's own admissions as to this.  We also

22   have the electronic devices; the contents from the Google

23   account -- all of these things suggest that the weight of

24   the evidence is very strong; and that factor, too, weighs in

25   favor of detention.

1          So then we go to the last factor, which is the

2     history and characteristics of the offender -- and we agree

3     that this is a more difficult factor.  I do think that, when

4     you look at this factor, you can't ignore that this

5     activity -- this criminal activity was repeatedly being

6     done; that it wasn't a one-time spontaneous decision by

7     Mr. Glover; that it was a decision he made day in and day

8     out.  And each and every time he looked at a video of a

9     child being abused, he was committing an offense; and I

10    think you do have to consider that along with all of the

11    positive factors.  He does have quite a few positive factors

12    when you look at those factors.

13         All in all, Your Honor, the government submits

14    these factors weigh in favor of detention; this is a

15    presumption case, and we request that the defendant remain

16    detained pending trial in this case.

17         THE COURT:  Thank you.

18         Ms. Schuck, are you on the line?

19         MS. SCHUCK:  Yes, Your Honor.

20         Good afternoon, Your Honor.  Christine Schuck,

21    pretrial services.

22         THE COURT:  Yes.  Thank you for being here.

23         So could you just share with us information about

24    the -- first of all, we are correct that pretrial services

25    does not do home visits of people on pretrial release,

1    announced or unannounced; is that correct?

2              MS. SCHUCK:  That is correct, Your Honor.

3              THE COURT:  And so then Ms. Schuck --

4              MS. SCHUCK:  And --

5              THE COURT:  -- go ahead.  Yes.

6              MS. SCHUCK:  I was going to note for Your Honor,

7    in reference to the four cases that were cited by defense

8    counsel in the memorandum, only one of them is being

9    supervised by D.C. pretrial services; and that is the

10   Roberson case.

11             And in reference to the Sharp case, which is the

12   one that -- for lack of a better word, serves as the

13   template that the magistrates are using to class these

14   convictions that are listed in the addendum -- the father is

15   an IT tech, so he was very well versed on how to do

16   passwords, et cetera; so I just wanted to make those two

17   notes for the Court in reference to the cases that were

18   cited for Your Honor in the defense's motion.

19             THE COURT:  Thank you, Ms. Schuck.

20             And have you now visited the aunt's home?

21             MS. SCHUCK:  No, Your Honor.

22             We have not visited the aunt's home.  But I did do

23   some research because she did mention to us that she

24   receives cable TV through RCN network.  And in doing some

25   research, RCN is -- they are an internet provider, and they

1    do allow for TV.  And when I clicked on their website, under

2    "TV" it has several different options, like "TiVo

3    Experience," "TiVo Stream 4K," "Streaming & More"; which

4    gives me concern that there can be internet access through

5    the TV using -- when they are subscribed to RCN.

6         I've also had another case that was involving

7    child pornography that was being supervised by the Western

8    District of Washington; they did a home visit.  During a

9    home visit they found the individual was using a Roku device

10   to watch TV; and Roku allows for internet streaming.  I just

11   wanted to point that out to Your Honor; that it looked like

12   he was just watching TV but, indeed, he was actually

13   streaming it.  Again, that was only found during a home

14   visit, and it was actually on a -- actually a subsequent

15   home visit; they didn't catch it the first time.

16        But RCN, to me, looks like -- it's not like Cox

17   Communications or one of the typical internet provide- --

18   the cable TV that we would think of; it looked like there

19   could be internet access, in my view, just looking at this;

20   so I would not be comfortable with it.

21        THE COURT:  Right.  All right.  Thank you,

22   Ms. Schuck.

23        MR. GERMAN:  If I may.

24        THE COURT:  Yes, Mr. German.

25        I know that that is new information.

1          MR. GERMAN:  It is, Your Honor.  But, also, I am

2     just not sure that I am even following what it is that

3     they're saying.

4          In order for you to access the internet through

5     those -- Roku, you have to have a smart television; that's

6     not the case here, Your Honor.  I just don't know -- it

7     sounds very speculative; so I am not even sure what is going

8     on with that.

9          The information that I have, Your Honor, unless

10     told otherwise, is that there is no internet in the home and

11     there is no smart television in the home; you would not be

12     able to access the internet.  I am not sure what is being

13     implied here.

14          But again, Your Honor, I just want to leave the

15     Court with -- without internet or without any real devices

16     in the home, Your Honor, I guess I am -- I am not sure -- as

17     Your Honor mentioned earlier, I don't know how many more --

18     how much more restrictive it can get beyond this.  If we

19     cannot release Mr. Glover under these extreme number of

20     restrictions, then I am not sure who should be able to be

21     released; I think that's extremely problematic.

22          I think one of the things that I pointed out in

23     our motion are the conditions of the jail now; and I brought

24     this up in front of the magistrate judge.  And I explained

25     that -- I think even in normal times we should always be

1   very careful approaching incarcerating someone pretrial with

2   extreme caution.

3          Obviously, the Supreme Court has determined that

4   liberty is the norm, and people should be released on

5   pretrial.  But I think in these times, when we are in the

6   middle of a pandemic, when we are having so many issues --

7   not just at the D.C. jail but, also, we see the problems in

8   Lewisburg; we should really, really be thinking about what

9   conditions can be put in place to release the person.  And I

10  think here the magistrate judge has done that; I believe he

11  has gone above and beyond to put conditions in place.

12         I just want to briefly address the rebuttable

13  presumption.  Again, I certainly understand that.  But as I

14  am sure the Court knows, courts have been clear about that;

15  that there is a very minimal burden for the defense, Your

16  Honor, precisely because of the presumption of innocence.

17  Right?

18         And I think in many cases courts have looked at

19  someone like Mr. Glover who has absolutely no criminal

20  record, who has really great community support, lots of

21  long-term employment, things of that nature -- easily, that

22  meets the standard for rebutting the presumption, Your

23  Honor.  So, here, I think that presumption is easily

24  rebutted.  I'd ask the Court to consider that, and ask the

25  Court to release Mr. Glover under these very, very strict

1    restrictions.

2              THE COURT:  All right.  Thank you, Mr. German.

3              I am going to rule on the government's motion for

4    review of the magistrate judge's release of the defendant

5    pending trial.

6              Let me just begin by saying I have reviewed the

7    complaint, and the entire record.

8              And has the magistrate judge -- the preliminary

9    hearing has been postponed?  The defendant is not under

10   indictment.  Has the magistrate judge already made the

11   probable cause finding, or has the defense waived -- waived

12   that?  I mean, do you concede that there is probable cause

13   here, Mr. German, or do I have to make that finding?

14             MR. GERMAN:  We have not conceded that, Your

15   Honor.

16             THE COURT:  All right.  So --

17             MS. RUSSO:  The magistrate court did, for whatever

18   it's worth, make a finding, when he initially detained the

19   defendant --

20             THE COURT:  I see.

21             MS. RUSSO:  -- but then it was reconsidered; so he

22   released the defendant.  But I don't think that changes the

23   probable cause determination.

24             THE COURT:  All right.  Well, I am just going to

25   make the probable cause determination here then because --

1      just to make sure all the I's are dotted and the t's are

2      crossed.  And I do find that there is probable cause to

3      believe that the defendant received child pornography, in

4      violation of 18 U.S.C. Section 2252A(a)(2).

5            And let me just start with the legal standard I am

6      going to apply.  On a motion to revoke or modify a

7      magistrate judge's order of pretrial release, the district

8      court must conduct the review promptly under 18 U.S.C.

9      Section 3145(a).  Neither 18 U.S.C. Section 3142, nor 3145

10     specifies the standard of review to be applied by the

11     district court judge reviewing a magistrate judge's release

12     or detention order.

13           The D.C. Circuit hasn't resolved that issue of

14     which standard is applicable to a district court's review of

15     a magistrate judge's release order, or even whether the

16     magistrate judge's factual or other findings are entitled to

17     any deference; but this Court has exercised *de novo* review,

18     based on the text and structure of the Bail Reform Act and

19     the weight of authority from every other circuit to consider

20     this critical issue, and held that *de novo* review applies.

21     These decisions are all collected in *U.S. v Chrestman*,

22     2021 Westlaw 765662, at Footnote 5, a D.D.C. case from

23     February 26, 2021; and I will apply *de novo* review here.

24           The Bail Reform Act requires release of a

25     defendant prior to trial unless a judicial officer

1    determines, after a hearing, that:  No condition or

2    combination of conditions will reasonably assure the

3    appearance of the person as required and the safety of any

4    other person and the community; see 18 U.S.C. Section

5    3142(e)(1).

6              Even if the defendant doesn't pose a flight risk,

7    danger to the community alone is sufficient reason to order

8    pretrial detention; see *U.S. v Salerno*, 481 U.S. 739, jump

9    cite 755, from 1987.

10             If a judicial officer finds there is probable

11   cause to believe a defendant committed an offense involving

12   a minor victim, under 18 U.S.C. Section 2252A(a)(2), a

13   rebuttable presumption applies that the defendant

14   constitutes a danger to the community, and that no pretrial

15   release condition or combination of conditions may be

16   imposed to assure the safety of any other person and the

17   community; see 18 U.S.C. Section 3142(e)(3)(E).

18             Once a rebuttable presumption is triggered, the

19   presumption imposes a burden of production on the defendant

20   to offer some credible evidence contrary to the statutory

21   presumption; see *U.S. v Alatishe*, 768 F.2d 364, jump cite

22   371, D.C. Circuit case from 1985.

23             Even where a defendant offers evidence to rebut

24   the presumption, the presumption is not erased because it

25   represents Congress's general factual view about the special

1   risks of danger to the community presented by defendants who

2   commit the crimes to which it attaches; see *U.S. v Bess*,

3   678 F. Supp. 929, jump cite 934, a D.D.C. case from 1988.

4   Rather, the presumption is incorporated into the other

5   factors considered by the Court in determining whether to

6   grant a conditional release and is given substantial weight;

7   see *U.S. v Ali Muhamed Ali*, 793 F.Supp. 2d 386, jump cite

8   391, a D.D.C. case from 2011.

9          So, as I have already mentioned, the defendant

10  hasn't been indicted; and so I can't rely on a grand jury

11  indictment as showing probable cause to believe he committed

12  the crimes charged but must review the evidence *de novo*.

13         Here, as I have mentioned, he has been charged

14  with offenses involving a minor victim pursuant to 18 U.S.C.

15  Section 2252A(a); and the Court finds, based on the

16  government's proffer of evidence, that there is probable

17  cause to believe he committed the crimes alleged in the

18  complaint, including receipt of child pornography, in

19  violation of 2252A and (a)(2); and possession of child

20  pornography, in violation of 18 U.S.C. 2252(a)(5).

21         Briefly, the evidence presented, as detailed in

22  the statement of facts attached to the criminal complaint,

23  and further supplemented by the government's briefing

24  throughout these detention hearings, shows that, at the time

25  of the execution of the search warrant on his residence

1    where he lived alone, agents interrupted the defendant

2    actually -- apparently having child pornography videos on

3    his computer screens, since the agents observed playing on

4    his computer screens a video showing an infant with an adult

5    male putting his erect penis on or around the infant's

6    mouth; plus, a video showing a female infant who was naked

7    from the waist down, and an adult male penetrating or

8    attempting to penetrate the infant's vagina with his erect

9    penis, or raping the infant.

10            In addition, the defendant received over 25 videos

11    through his membership in at least four chat groups on

12    "Application A," which the government has identified as

13    Telegram, which he could access on his phone.  And they have

14    found, according to the government, over 100 child

15    pornography videos on his iPhone and over 30 videos so far

16    on his laptop of child pornography, although the forensic

17    examination is continuing -- both of those devices, the

18    other 11 devices apparently taken from his apartment at the

19    time of the execution of the search warrant, as well as in

20    the multiple platforms in which the defendant stored

21    material, including a Google drive, MEGA, Dropbox; and, I

22    guess, perhaps -- I am not really clear on that -- perhaps

23    even on the Telegram application.

24            The defendant admitted, at the time of the

25    execution of the search warrant -- and made admissions about

1    his viewing of child pornography, and all of these

2    circumstances and the forensic evidence -- all put

3    together -- establish clear probable cause to believe the

4    defendant committed the charged offenses and, also, that the

5    rebuttable presumption, under Section 3142(e)(3)(E), is

6    triggered.

7           So in determining whether any conditions of

8    release will reasonably assure the appearance of the person

9    as required and the safety of others, the Court must take

10   into account the available information concerning four

11   factors set out in Section 3142(g), including the nature and

12   circumstances of the offense charged; the weight of the

13   evidence against the person; the history and characteristics

14   of the person; and the nature and seriousness of the danger

15   to any person or the community posed by the person's

16   release.

17          I don't think there is any real dispute as to the

18   first factor, that the nature and circumstances of the

19   charged offense heavily favors detention here.  These are

20   extremely serious felony offenses with which the defendant

21   is charged since they involve the most vulnerable members of

22   our community, children -- infants even.

23          Through his communication with, apparently,

24   like-minded individuals via group chats available on his

25   cell phone, and he was watching them on his laptop computer

1    screen at the time of the execution of the search warrant,

2    the defendant received and possessed child pornography

3    depicting children as young as five or six years old; and on

4    the screen, at the time of the execution of the warrant, two

5    different videos of infants, one of whom was being raped.

6          The defendant has apparently -- although the

7    forensic examination is continuing by law enforcement, but

8    they have already been able to determine that he's been

9    engaging in the receipt and possession of child pornography

10   for at least a year, and is facing a significant amount of

11   time, including mandatory terms of incarceration, based on

12   this conduct.

13         The government describes and proffers that the

14   defendant was a significant participant in an online

15   community that was dedicated to the sexual exploitation of

16   children by using messenger services to meet, communicate,

17   and exchange links and videos containing child pornography.

18         As I have already mentioned a few times, on the

19   day of his arrest, at six o'clock in the morning of

20   September 21, he was, by his own admission -- and what he

21   told law enforcement was that he was naked; he was watching

22   a child pornography video that was playing on two screens,

23   including one screen that was showing a whole group chat,

24   with some of the men on that group chat masturbating as they

25   were watching the video in a virtual conference room.

1          The government proffers that the defendant was

2     allegedly part of at least four groups, chat groups, on

3     Telegram dedicated to the sexual exploitation of children.

4     He was a sophisticated user of technology who had over 13

5     electronic devices.  He engaged in and took measures to

6     avoid detection by law enforcement and, in fact, had

7     conversations.  They discovered one chat already on Telegram

8     with one group where they talked about ways to avoid the

9     police, and the Telegram chat is encrypted.

10         The government explains it was only able to

11    apprehend the defendant due to law enforcement's

12    infiltration of one of these chats on Telegram in which the

13    defendant was a member.  And they have already discovered,

14    as I have already mentioned, a number of child pornography

15    images on a couple of his devices, the laptop and the

16    iPhone, so far.

17         The defendant -- the government also says that the

18    defendant may have been an administrator for one of the

19    group chats on application -- on the Telegram application,

20    that was dedicated to sexually exploiting children, and that

21    one of the groups focused especially on young children,

22    infants, and toddlers.

23         It's difficult to overstate the gravity of this

24    alleged conduct which does suggest, as the government

25    proffers, that he was a sophisticated user of technology;

1    savvy -- not only with technology, but how to use secure

2    applications and means to bypass law enforcement efforts to

3    detect his behavior, and that he was a committed user with

4    these chat rooms -- and the numbers of videos already found

5    on his electronic devices -- pretty committed to obtaining,

6    viewing, and engaging with other people on these chat groups

7    in child pornography.

8             It is troubling that he did describe himself as a

9    dad, which -- in the context of these chat rooms of people

10   who are pedophiles, it is risky; it shows trying to endear

11   himself and to show that he would be a valuable member of

12   the group to maintain his membership, at a minimum.

13            As to the weight of the evidence, it's

14   overwhelming in this case given what the law enforcement

15   agents saw when they broke down the door of his apartment

16   and he was -- and what was up on the screen; and then, in

17   addition to what the forensic evidence has already shown

18   from his laptop and his iPhone, and the defendant's own

19   admissions on the day of his arrest, that he viewed child

20   pornography through his use of Telegram, and that some of

21   the materials he had received depicted very young children.

22   Therefore, the Court finds that the weight of the evidence

23   favors detention.

24            As to his history and characteristics, he has no

25   criminal convictions, has lifelong ties to the Washington

49

1    area.  As Mr. German has said, he has the great support of

2    his family and his community.  He has an aunt and a cousin

3    willing to step forward to monitor his behavior while he is

4    facing these criminal charges.  He has had a steady job with

5    the federal government for over two decades; and so all of

6    this makes this a difficult case.  And I can well understand

7    why the magistrate judge was looking for ways to take

8    advantage of the defendant's family support to find a way to

9    find conditions that would assure the safety of the

10   community were he released.

11         But I am also well aware, as the government has

12   suggested, that this was not a spontaneous decision, a

13   one-time thing, when the defendant engaged in this conduct.

14   And I also can't ignore the fact that on the day the search

15   warrant was executed at his residence the -- law enforcement

16   also discovered a small personal use amount of

17   methamphetamine on his desk where the computers were running

18   the child pornography videos and the fellow chat room men,

19   including those masturbating to the images.

20         Nevertheless, despite the drugs and his admissions

21   at the time about watching child pornography -- his

22   admissions to that, his history, his characteristics weigh

23   slightly in favor of his release.

24         Finally, as to the fourth factor, the danger to

25   the community posed by the defendant, this also weighs in

1    favor of detention.  Illicit sexual conduct, child

2    pornography, takes an incredible toll on all of the children

3    involved; it poses a danger to other children because

4    everybody who watches child pornography videos is helping to

5    create and fuel this market for even more child pornography

6    and putting more children at risk.

7         The danger posed by people who engage in the

8    receipt, possession of child pornography is part of what

9    informed Congress when it created the statutory presumption

10   for detention in these cases; and in this case it's not

11   merely the receipt of child pornography, the possession of

12   child pornography, it is all of the context in which this

13   defendant engaged in that conduct; participating in these

14   secret, sophisticated communities online that foster the

15   continuing exploitation of children at shockingly young

16   ages, even infants, using tools and applications, other

17   conduct, to conceal their illegal activity which makes it

18   increasingly hard to identify them.

19        The magistrate judge was aware of all of this and

20   put in every condition that he could think of to --

21   including -- you know, to reasonably assure the safety of

22   the community, including conditions even to the removal of

23   the defendant's bedroom door -- basically house arrest --

24   under the supervision of his cousin and his aunt, so that he

25   would be constantly supervised by one of them to ensure he

1    doesn't have access to internet-capable devices, and a

2    promise from the custodians to conduct a daily random search

3    of the defendant and his room to ensure he is not in

4    possession of electronic devices.  I think Mr. German is

5    right when he says the magistrate judge went above and

6    beyond to set conditions to try and address the government's

7    concern and the safety of the community; but I -- I don't

8    think that his aunt and his cousin are law enforcement

9    officers.

10               I actually think that this is an effort to convert

11   family members who love their cousin, their nephew, into law

12   enforcement officers; and that is not what they are.  I

13   don't -- they are not professionals; this is not their job.

14   Maybe the first week they'll be stringent, but they're going

15   to relax.  It's not their job; they're not trained to do

16   this.

17               I have concerns that a lot of these conditions,

18   like the removal of the defendant's bedroom door in a

19   three-story house, with lots of other places for the

20   defendant to be able to go for privacy, are all -- is not

21   sufficient to ensure that this defendant won't borrow a

22   phone, get access to the phone, whether the television -- as

23   the pretrial services officer said -- might provide internet

24   connection.  Mr. German says it's not a smart television,

25   but it's not really clear.  All of this is just not enough,

1   to my mind, to overcome the factors that weigh strongly in

2   favor of detention here.

3           So, for those reasons, upon consideration of the

4   hearing evidence -- the proffered evidence presented, the

5   factors set forth in 18 U.S.C. Section 3142(g), the possible

6   release conditions that the magistrate judge pulled

7   together, the Court finds clear and convincing evidence that

8   the defendant's pretrial release would constitute a danger

9   to the community.  There are no conditions or combination of

10  conditions that may be imposed that would reasonably assure

11  the safety of the community were he to be released pending

12  trial.  So, therefore, the Court overrules the magistrate

13  judge's November 15th, 2021, ruling, and the defendant shall

14  be detained pretrial.

15          Is there anything further today from the

16  government?

17          MS. RUSSO:  No.  Nothing from the government, Your

18  Honor.  Thank you.

19          THE COURT:  Mr. German, anything further from you?

20          MR. GERMAN:  No, Your Honor.

21          THE COURT:  All right.  You are all excused.

22          MS. RUSSO:  Thank you, Your Honor.

23          (Whereupon, the proceeding concludes, 2:53 p.m.)

24                        *  *  *  *  *

25

## <u>CERTIFICATE</u>

     I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

     PLEASE NOTE:  This hearing was held via videoconference and/or telephonically in compliance with the COVID-19 pandemic stay-safer-at-home recommendations and is therefore subject to the limitations associated with the use of technology, including but not limited to telephone signal interference, static, signal interruptions, and other restrictions and limitations associated with remote court reporting via telephone, speakerphone, and/or videoconferencing capabilities.

     This certificate shall be considered null and void if the transcript is disassembled and/or photocopied in any manner by any party without authorization of the signatory below.

    Dated this 9th day of December, 2021.

    <u>/s/ Elizabeth Saint-Loth, RPR, FCRR</u>
    Official Court Reporter